# EXHIBIT Q

# Police Use of Force in New York City:

# Findings and Recommendations on NYPD's Policies and Practices

**New York City Department of Investigation**
**Office of the Inspector General for the NYPD (OIG-NYPD)**



Mark G. Peters
Commissioner

Philip K. Eure
Inspector General for the NYPD

October 1, 2015

## Table of Contents

I.     **Executive Summary and Introduction** ..................................................................... 1

II.    **Methodology** ................................................................................................... 6

III.   **Analytics from 179 Substantiated Use-of-Force CCRB Cases** ............................. 10

IV.   **Tracking Force Incidents Involving NYPD Officers** ............................................ 20
     a.   The Importance of Reporting and Documenting Force Incidents .......................... 20
     b.   NYPD's Policies and Practices Regarding Force Reporting and Documentation ........ 21
         i.   NYPD Patrol Guide Does Not Define "Force" or Establish Levels of Force .... 21
         ii.   NYPD Lacks a Uniform Policy on Reporting Force Incidents .......................... 23
         iii.   NYPD Force Reporting Is Inconsistent in Practice ......................................... 24
     c.   The Need for Uniform Force Reporting and Documentation ................................... 26

V.    **Force De-Escalation Policies and Practices in NYPD** ........................................... 28
     a.   De-Escalation in the Field: Missed Opportunities by NYPD Officers .......................... 28
     b.   NYPD's De-Escalation Policies: Areas for Improvement ........................................... 34
         i.   NYPD Patrol Guide ................................................................................... 34
         ii.   Model Practices ...................................................................................... 34

VI.   **NYPD Training** ................................................................................................. 39
     a.   The Importance of Training ................................................................................ 39
     b.   NYPD Training Overview ................................................................................... 39
         i.   Police Academy Education and Training Center .......................................... 39
             1.   Academy Courses Relevant to Use of Force ...................................... 39
             2.   Scenario/Simulation (Firearms and Tactics) ...................................... 40
         ii.   In-Service Training ................................................................................... 41
     c.   Model Practices for De-Escalation Training ......................................................... 42
     d.   Assessment of NYPD's Training ......................................................................... 43
         i.   Academy Training .................................................................................... 43
         ii.   In-Service Training ................................................................................... 44

VII.   **Discipline** ...................................................................................................... 45
     a.   OIG-NYPD's Departures from CCRB's Recommendations ...................................... 45
     b.   Disciplinary Outcomes Across 104 Substantiated Use-of-Force Allegations ............. 46
         i.   Measuring the Penalty ............................................................................. 54
     c.   Changes in How CCRB and NYPD Work Together .................................................. 55
         i.   Requirement to Provide Written Explanation for Downward Departures .... 55
         ii.   Reconsideration ...................................................................................... 56

VIII.   **Recommendations** ........................................................................................ 58

IX.   **Appendices**

## I.    Executive Summary and Introduction

Use of force is a defining issue in modern policing. Police officers, by the very nature of their duties, are entrusted, empowered, and at times obligated by local governments to use force against citizens when appropriate. In exchange for this grant of power, communities and their police departments require that the use of force be governed by a set of standards. These standards stem from the premise that the force used must be reasonable, an idea rooted in the Fourth Amendment of the Constitution of the United States. Reasonable use of force and constitutional policing require equal treatment of all individuals, proper application of force, and accountability for the conduct of police officers.

Following the death of Eric Garner in Staten Island in 2014 and others across the nation, there has been a public call for greater accountability when police officers use force that appears neither reasonable nor proportional. Police departments and police accountability agencies across the country have taken up the issue of use of force in an effort to improve policing and ensure that all officers are worthy of the tremendous power and trust afforded them by their communities.

In January 2015, the New York City Department of Investigation's Office of the Inspector General for the New York City Police Department (OIG-NYPD) released its first report, *Observations on Accountability and Transparency in Ten NYPD Chokehold Cases* (Chokehold Report). In that report, OIG-NYPD found that the New York City Police Department (NYPD) disciplinary system was complex, multi-tiered, and often delivered inconsistent results in cases involving chokeholds. OIG-NYPD promised to further investigate NYPD's use of force by reviewing a larger sample of force investigations. This Report, which is a larger and more sophisticated inquiry into use of force, fulfills that promise. Many of the issues addressed in the Chokehold Report surface again in this larger data set.

This Report examines five aspects of use of force within NYPD: (1) trends; (2) reporting; (3) de-escalation; (4) training; and (5) discipline. The Report begins by highlighting data and trends from excessive or unnecessary force cases substantiated by the Civilian Complaint Review Board (CCRB). CCRB substantiated 207 allegations of force in 179 cases between 2010 and 2014, a notably modest number, given the size of NYPD, and a positive indication of the NYPD's restraint.[1] OIG-NYPD's review involved only non-deadly force cases investigated by

* NYC Department of Investigation Commissioner Mark G. Peters and Inspector General for the NYPD Philip K. Eure thank the staff of OIG-NYPD for their efforts, persistence, and insight in helping to produce this Report, especially Sandra Musumeci, Deputy Inspector General; Asim Rehman, General Counsel; Thomas Mahoney, Director of Investigations; V-Tsien Fan, Senior Policy Manager; J. Olabisi Matthews, Senior Investigator; Joseph Carinha, Senior Investigator; Constance Gonzalez-Hood, Senior Investigator; Cynthia Kao, Examining Attorney; Michael Acampora, Special Investigator; Patrick Cahill, Special Investigator; Joseph Procopio, Special Investigator; Arturo Sanchez, Special Investigator; Sarolta Sandor, Special Investigator; Kanika Khanna, Policy Analyst; Justyn Richardson, Policy Analyst; Alessandra Sienra-Canas, Policy Analyst; Marielle Moore, Policy Analyst; Christopher Tellet, Policy Analyst; Syed A. Ameer, Auditor; Betty Diop, Data Assistant; Senora Harvey, Clerical Assistant; and Alison Rogers, Legal

CCRB, as no lethal force was used in the 179 substantiated cases. As discussed below, this investigation demonstrates several issues of real concern.

Because accountability begins with access to reliable data, this Report describes how NYPD does and does not track use-of-force data, and how the usefulness of that information can be improved by adopting a more precise use-of-force policy coupled with standardized force reporting.

This Report next presents the findings of an independent analysis of force cases where some officers not only missed the opportunity to de-escalate the incident, but took measures which affirmatively escalated the encounter. Given these findings, the Report examines policies of other law enforcement agencies regarding de-escalation tactics and reviews what NYPD is currently doing to address excessive force and de-escalation through training. The Report then suggests ways in which training and policy can be improved with respect to de-escalation tactics and other related skills.

Lastly, this Report analyzes and evaluates NYPD's disciplinary system, including a close review of cases where OIG-NYPD, through independent review, determined that the use of force was not reasonable by any standard and not justified by any exigent circumstances or the need to protect an officer's or the public's safety. **Historically, *NYPD has frequently failed to discipline officers who use force without justification.*** This Report thus offers recommendations to improve the disciplinary process so that officers who use excessive force are properly held accountable.

OIG-NYPD's analysis and recommendations are based on NYPD policies and practices as of the date of publication of this Report. NYPD, however, has informed OIG-NYPD that it has been reviewing its use-of-force policies and procedures and that it anticipates making revisions to the Patrol Guide regarding the use of force in the near future. The potential areas of revision include updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use-of-force incidents, reporting obligations concerning force incidents, and data analysis on use-of-force incidents. NYPD has also recently created a dedicated Force Investigation Division to investigate all firearm discharges, deaths in custody, and use-of-force incidents that are likely to cause death. NYPD recently briefed OIG-NYPD on these new policies and procedures; it is clear that the proposed changes, when implemented, will address a number of the concerns raised in this Report.

---

Intern. The contributions made by Lesley Brovner, First Deputy Commissioner, are also appreciated. Our gratitude is also extended to the New York City Police Department and other agencies and organizations noted for their cooperation during the preparation of this Report.

[1] This total of 207 substantiated force allegations is based on the data provided to OIG-NYPD by CCRB. The total number of substantiated force allegations represents approximately 2.0% of the more than 10,000 allegations of force received by CCRB from 2010 to 2014. *See* CCRB, APP. A CCRB COMPLAINT DATA 2014 (2015), http://www.nyc.gov/html/ccrb/downloads/pdf/2014-annual-report-stats-appendix.pdf (last visited Sep 8, 2015).

Case 1:15-cv-01989-KBF Document 75 Filed 07/16/15 Page 6 of 90

For this Report, OIG-NYPD assembled a team with professional backgrounds in law enforcement, police oversight, law, and quantitative and qualitative data analysis. This multi-disciplinary team engaged in an investigation that included, among other things:

- A detailed analysis of all 179 cases where CCRB determined that officers used excessive or unnecessary force from 2010 to 2014;
- A review of the accompanying NYPD disciplinary records for over 100 cases that had reached final disciplinary dispositions as of the writing of this Report;
- An assessment of NYPD Patrol Guide procedures on use of force and a review of policies of other police departments;
- Evaluation of NYPD's Police Academy and in-service training modules on use of force.

Through this work, OIG-NYPD reached several conclusions regarding NYPD use-of-force policies, practices, training, and discipline:

> **NYPD's current use-of-force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force.** NYPD's current use-of-force Patrol Guide procedure, which is barely more than a page of text, is completely silent on what actions constitute "force." The Patrol Guide likewise prohibits "excessive force" while offering no clarity on what constitutes "excessive force." Officers are given few clear-cut rules when determining whether their actions constitute force and whether such actions must be reported. As a result, NYPD should adopt a more precise use-of-force Patrol Guide procedure that includes greater clarity on what is meant by "force," "excessive force," and "deadly physical force."

> **NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter.** The lack of a centralized, uniform use-of-force reporting mechanism leaves officers without guidance about reporting force and NYPD without adequate data regarding police officer use of force. It is currently impossible to accurately and comprehensively track the use of force by NYPD officers. As a result, NYPD should revise its use-of-force policy to create a new reporting form that requires officers to capture <u>all</u> incidents of force using descriptive language.

> **NYPD's Patrol Guide does not properly instruct officers to de-escalate encounters with the public.** Considering NYPD's stated commitment to de-escalation training, the overall benefits of such strategies in policing, and the strides that have been made in updating the policies of peer law enforcement agencies, the Department should include de-escalation principles as part of its use-of-force procedures in the Patrol Guide.

3

➢ **NYPD training does not adequately focus on de-escalation.** There is little to no substantive focus on de-escalation in NYPD's training programs. The Department should bolster its efforts to train officers in de-escalation and do more to reinforce its importance. NYPD should add a specific Police Academy course on de-escalation and incorporate such tactics more heavily in its classroom and practical training environments.

➢ **In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force.** NYPD imposed no discipline with respect to 37 of 104, or 35.6%, of substantiated allegations in which OIG-NYPD's independent review confirmed that officers used excessive force that was not warranted under the circumstances. For those cases decided in the four years between 2010 and 2013, NYPD declined to impose discipline in 34 of 77 allegations, or 44.1% of the time. NYPD, however, declined discipline in three of 27 allegations, or 11.1% of the time, in the cases decided in 2014 and 2015. Although the rate is trending downward, given the small number of data points since January 2014, OIG-NYPD will continue to monitor the issue.

➢ **NYPD and CCRB continue to disagree on how officers should be held accountable for use of excessive force, but the two agencies have taken steps towards harmonizing disciplinary results and improving agency cooperation.** Across 92 substantiated use-of-force allegations, NYPD departed downward from CCRB's disciplinary recommendations—or imposed no disciplinary action whatsoever—67.4% of the time.[2] A review of the NYPD's disciplinary decisions since January 2014 indicates that the rate of disciplinary downgrading in use-of-force cases has recently slowed. Of the 20 disciplinary determinations reviewed during this period, NYPD imposed a lesser or no penalty in four instances, or 20.0% of the time. Nevertheless, the gulf between CCRB and NYPD remains. These findings show that the dissonance between NYPD and CCRB observed in OIG-NYPD's Chokehold Report is part of a larger pattern of incongruous disciplinary decisions. In recent years, however, a number of changes have been made regarding how NYPD and CCRB interact. Among these developments is the reconsideration process whereby NYPD can request that CCRB re-review a determination or penalty recommendation. Since the reconsideration process went into effect in December 2014, rather than depart downward from CCRB's disciplinary recommendations, NYPD has sent cases back to CCRB to be reviewed again. OIG-NYPD has not yet reviewed the full effects of the new reconsideration process.

---

[2] For information explaining why this analysis involved 92 substantiated allegations — as opposed to the previously mentioned 104 substantiated allegations — please see **Section VII: Discipline**.

> **NYPD should publish an annual report addressing the use of force by officers.** This report would track and collect various components related to use of force, including those addressed in this Report, such as officer tenure, assignments, age, type of force used, pertinent information regarding members of the public subjected to force, as well as officer injuries, disciplinary trends and outcomes, and other data deemed necessary for a comprehensive understanding of the issue. Such a report would promote greater transparency and accountability while allowing NYPD to consolidate and learn from data on use of force.

5

## II.  Methodology

For this Report, OIG-NYPD assembled a team with professional backgrounds in law enforcement, police oversight, law, and quantitative and qualitative data analysis.  The team conducted a rigorous and meticulous investigation and review of the pertinent issues related to use-of-force incidents involving NYPD.[3]

OIG-NYPD began by reviewing existing literature from a variety of sources, both policy-oriented and academic, to gain a comprehensive understanding of the research methods and findings on police use of force.  OIG-NYPD then reviewed the policies and procedures of NYPD and other police departments nationwide.

OIG-NYPD examined all cases from 2010 to 2014 in which CCRB substantiated force allegations.[4]  OIG-NYPD tracked these 179 cases from their substantiation by CCRB to the end of their respective life cycles at NYPD.[5]  OIG-NYPD selected these CCRB cases for inquiry because that agency had already made determinations after full investigations that officers unjustifiably used excessive or unnecessary force.  OIG-NYPD thereafter conducted its own review of the force allegations.  Among the force types substantiated by CCRB were physical contact, chokeholds, pepper spray, and a shooting.[6]  Each case was reviewed in order to identify several variables, which included:

- Subject officers' assignment and tenure;
- Age, gender, and race or national origin of subject officers;
- Age, gender, and race or national origin of complainants;[7]
- Whether and how force was documented.

---

[3] OIG-NYPD's team was supervised by a former prosecutor with a Ph.D. in criminology and justice policy and an attorney with experience in police oversight.  The team members responsible for the review of the substantiated force cases included individuals with advanced degrees in criminal justice and public policy and experience in auditing, policy research, and academia.  The team members responsible for the de-escalation review included a former police oversight investigator, a veteran of Ireland's National Police Service, and a former member of the U.S. Secret Service Uniformed Division.  This team received guidance from a retired NYPD lieutenant and a retired NYPD detective who have a combined 55 years of experience with NYPD.

[4] Because there were only nine closed cases with incident dates in 2014, cases from that year represent only 5.0% of the sample.  Any additional force complaints from 2014 may still be under investigation.

[5] In some instances, the substantiated CCRB cases proceeded from the disciplinary recommendation by that agency's Board to administrative prosecution before the NYPD Deputy Commissioner of Trials and ultimately to the Police Commissioner, where a final decision on the discipline was made.  In other instances, the CCRB cases were closed at earlier points in the process without discipline being imposed, such as when an investigation was dismissed because it went beyond the 18-month statute of limitations for administrative charges.

[6] One case in this review involved an incident in which a man was shot in the buttocks by the subject officer.  CCRB investigated the incident as a "gun fired" allegation and the Internal Affairs Bureau (IAB), the unit within NYPD responsible for investigating the use of deadly force at the time, also investigated the incident.

[7] For the purposes of this Report, all individuals identified by CCRB as *victims* will be referred to as *complainants*. Complainants include those who filed the complaint themselves and those who had complaints filed on their behalf.

In addition to recording and compiling statistical data on the 179 substantiated CCRB use-of-force cases, OIG-NYPD designated a specialized group to conduct a specific case-by-case review of each CCRB-substantiated allegation with a focus on de-escalation tactics and a variety of related elements. The investigators in this group determined the incident dynamics for each force allegation, based on the contents of the relevant CCRB investigative files (including first-hand evidence, such as video footage), and tracked criteria such as:

- Whether the complainant physically resisted the officers in any way;
- Whether any use of force was necessary to achieve a legitimate aim;
- Whether the force used was proportionate under the circumstances;
- Whether the use of force was objectively reasonable; and
- Whether de-escalation techniques could have been deployed as an alternative.

OIG-NYPD staff also visited NYPD's Police Academy Education and Training Center (Academy) on multiple occasions, observed scenario and simulator-based trainings, and interviewed numerous recruits, instructors, and policymakers regarding training, use of force, and de-escalation. OIG-NYPD performed a careful review of the Academy's syllabus and analyzed various course materials. OIG-NYPD likewise reviewed the policies and procedures of NYPD and several law enforcement agencies across the country and conducted research on model practices by examining alternative use-of-force models, U.S. Department of Justice reports, and related studies. OIG-NYPD also explored issues such as the effectiveness of training and the requirements for recruiting and appointing trainers.

In assessing whether officers were appropriately disciplined for having used excessive force, OIG-NYPD followed each substantiated CCRB force allegation as it made its way through NYPD's complex disciplinary system. This included a review of the documents considered by the NYPD Department Advocate's Office (DAO) and CCRB's Administrative Prosecution Unit (APU) in formulating recommendations for penalties for the subject officers and whether such documents — such as monitoring history, Department recognitions, and evaluations by commanding officers — are used appropriately and effectively. OIG-NYPD also noted the frequency of departures between CCRB's recommended discipline and the final discipline imposed by the Police Commissioner. In addition to analyzing the DAO and APU files, OIG-NYPD also examined the changes that both CCRB and NYPD have adopted, such as the reconsideration of some CCRB determinations, in an effort to improve NYPD's disciplinary system.[8]

---

[8] OIG-NYPD also sent former Police Commissioner Raymond Kelly an invitation to meet and discuss the Report's investigative findings prior to the publication of this Report. Commissioner Kelly declined to meet with OIG-NYPD.

### NYPD Patrol Guide Procedures Regarding Force

The NYPD Patrol Guide contains several procedures regarding the use of force, the full language of which is attached to this Report as Appendix A. These procedures include the following:

#### PATROL GUIDE §203-11 USE OF FORCE

Patrol Guide §203-11 provides that all uniformed members of service are "responsible and accountable for the proper use of force under appropriate circumstances." Patrol Guide §203-11 further permits officers to use the "amount of force necessary to overcome resistance . . . to effect an arrest or take a mentally ill or emotionally disturbed person into custody."[9]

#### PATROL GUIDE §203-12 DEADLY PHYSICAL FORCE

Patrol Guide §203-12 acknowledges that deadly physical force is the most serious act that an officer can engage in. The procedure states that officers "should use only the minimal amount of force necessary to protect human life." Officers cannot use deadly force "unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury."[10]

#### PATROL GUIDE §212-95 USE OF PEPPER SPRAY DEVICES

Patrol Guide §212-95 provides officers with guidelines for both the usage of pepper spray and the documentation of that usage. Per the Patrol Guide procedure, "pepper spray may be used when a member reasonably believes it is necessary to effect an arrest of a resisting suspect, for self-defense or defense of another from unlawful force, or to take a resisting emotionally disturbed person into custody." Patrol Guide §212-95 continues, "In many cases, pepper spray will reduce or eliminate the need for substantial physical force to effect an arrest or gain custody. It will often reduce the potential for injuries to members and suspects that may result from physical restraint and it should be regarded as a possible alternative to such force and restraint, where practical." Patrol Guide §212-95 notes that pepper spray is not to be used in situations that do not require any physical force and that it "may be used in arrest or custodial restrain situations where physical presence and/or verbal commands have not been, or would not be, effective in overcoming physical resistance."[11]

---

[9] 2014 NYPD PATROL GUIDE, USE OF FORCE [PROC. NO.] 203-11 (Effective Aug. 1, 2013).
[10] 2014 NYPD PATROL GUIDE, DEADLY PHYSICAL FORCE [PROC. NO.] 203-12 (Effective Aug. 1, 2013).
[11] 2014 NYPD PATROL GUIDE, USE OF PEPPER SPRAY DEVICES [PROC. NO.] 212-95 (Effective Aug. 1, 2013).

### PATROL GUIDE §212-117 USE OF CONDUCTED ENERGY DEVICES

Patrol Guide §212-117 is designed to "inform members of the service of circumstances under which a Conductive Energy Device (CED) [commonly referred to as a "Taser"] may be intentionally used and to record instances when a Conducted Energy Device has been used." Patrol Guide §212-117 provides that a "CED is classified as a less lethal device and is intended to augment and provide a greater margin of safety for officers who might otherwise be forced to physically subdue a dangerous subject. The use of a CED is within the range of use of less lethal devices such as pepper spray or a baton on the force continuum due to its effectiveness at a distance and at close range." The provision further states that "[i]t is strictly prohibited to use the CED on persons as a form of coercion or punishment and on persons who passively resist (e.g., going limp, offering no active physical resistance)."[12]

---

[12] 2014 NYPD PATROL GUIDE, USE OF CONDUCTED ENERGY DEVICES (CED) [PROC. NO.] 212-117 (Effective Aug. 1, 2013).

### III. Analytics from 179 Substantiated Use-of-Force CCRB Cases

Until NYPD has a formal and comprehensive method for collecting force data, numerous questions about use-of-force practices will remain unanswered. In the interim, significant observations can still be made by studying alternative data sets. This section presents several statistical observations regarding officers and complainants in use-of-force encounters. The data in this section are drawn from the 179 substantiated CCRB force cases reviewed by OIG-NYPD and other relevant sources. Although the observations and findings from the data analyzed here are based on a subset of force cases, they may be indicative of broader trends and patterns in NYPD.

**Figure 1: Allegations According to CCRB Force Type/Category**

| CCRB Force Type/Category | Number of Allegations Across All 179 Cases | Percentage |
|---|---|---|
| Physical Force | 137 | 66.2% |
| Nightstick/Other Instrument | 16 | 7.7% |
| Pepper Spray | 15 | 7.3% |
| Chokehold | 11 | 5.3% |
| Gun | 10 | 4.8% |
| Hit Against Inanimate Object | 9 | 4.4% |
| Vehicle | 4 | 1.9% |
| Other | 5 | 2.2% |
| **Total** | **207** | **100%** |

Figure 2 below illustrates the cases by use-of-force type, organized by year. The overwhelming majority of the substantiated complaints concerned physical force, as opposed to other forms of force. Although OIG-NYPD reviewed cases substantiated by CCRB between 2010 and 2014, one of the underlying force encounters involved in these cases dates back to 2005.

Case 1:15-cv-01989-KBF Document 75-17 Filed 05/04/16 Page 14 of 90

## Figure 2: Cases by Year and Force Type/Category[13]



---

[13] The CCRB case sample requested by OIG-NYPD contained 179 substantiated cases that were closed between 2010 and 2014. This sample included cases with incident dates going as far back as 2005, due to the length of time it took CCRB to close the investigation. Because there were only nine closed cases with incident dates in 2014, cases from that year represent only 5.0% of the sample. Any additional force complaints from 2014 may still be under investigation.

**Figure 3: Subject Officer Duty/Assignment at Time of Force Encounter**

| Duty/Assignment | Number of Officers Across All 179 Cases | Percentage |
|---|---|---|
| Patrol | 43 | 22.6% |
| Anti-Crime | 28 | 14.7% |
| Foot Post/Patrol | 21 | 11.1% |
| Impact | 21 | 11.1% |
| Conditions | 18 | 9.5% |
| Narcotics | 18 | 9.5% |
| Auto (Burglary/Buy/Bust) | 4 | 2.1% |
| Detective Squad | 4 | 2.1% |
| Gang | 4 | 2.1% |
| Housing | 4 | 2.1% |
| Sergeant/Lieutenant Operator | 3 | 1.6% |
| Central Booking | 2 | 1.1% |
| Transit | 2 | 1.1% |
| Various Individual Assignments (e.g., Fleet Services, Traffic, Sergeant Operator, etc.) | 18 | 9.5% |
| Total | 190 | 100% |

From the table above, it appears, not surprisingly, that officers assigned to duties that heavily involve interactions with the public represented most of the use-of-force complaints from the sample. Examples of such assignments include transit, patrol, impact, and conditions.[14]

---

[14] **Anti-Crime** officers are assigned to perform specialized patrol and enforcement in plainclothes. These officers conduct short-term investigations, patrol crime prone locations, and attempt to prevent violent street crime (i.e., assaults, burglaries, weapons offenses, sex crimes, and weapons possession).

**Conditions** officers are assigned to perform specialized patrol and enforcement of precinct-specific conditions at various locations that have been identified by precinct management. Conditions officers typically focus their enforcement efforts on "Quality of Life" issues such as open container violations, disorderly groups, graffiti, public urination, aggressive panhandling, and excessive noise complaints.

**Impact** officers were uniformed officers assigned within an "impact zone." "Operation Impact" was typically an officer's first assignment out of the Academy, and lasted approximately one to three years. Impact officers were assigned to violence-prone areas of the city in order to reduce crime through a "critical mass" of resources and enforcement action. Impact officers were not assigned to patrol, but rather they were deployed on strict foot posts within their zones and were responsible for addressing conditions within their post. Under Police Commissioner William Bratton, the Department modified the "Operation Impact" program such that new recruits are now first placed in local precincts, where they are able to work closely with more experienced officers in traditional precinct assignments.

**Figure 4: Tenure of Officers Involved in Force Encounters**



Figure 4 illustrates the years of service for subject officers involved in substantiated use-of-force cases. It is evident from the graph that the bulk of the cases involve officers who are in their first seven years of service.

13

POLICE USE OF FORCE IN NEW YORK CITY: FINDINGS AND RECOMMENDATIONS ON NYPD'S POLICIES AND PRACTICES
OCTOBER 2015

**Figure 5: Ages of Complainants**



**Figure 6: Ages of Officers**



Figures 5 and 6 above illustrate the age distribution of the subject officers and complainants in the analyzed cases. The charts show that such encounters more frequently involve both younger complainants and younger officers.

As seen in Figure 7a below, of the force cases OIG-NYPD reviewed, 96.8% of officers involved were male while 3.2% were female. These numbers raise the specter that the gender disparity among uniformed NYPD officers has a bearing on the volume of force encounters in New York City.[15] Figure 7b illustrates the gender composition of all uniformed NYPD officers, with males representing 83.0% of officers and females representing 17.0% of officers. It should also be noted that, as seen in Figure 8a, male complainants are predominantly represented in the sample as opposed to female complainants—87.1% of the complainants in the analyzed cases were men, while 12.9% of the complainants were women.[16]

---

[15] See KIM LONSWAY, ET AL., MEN, WOMEN, AND POLICE EXCESSIVE FORCE: A TALE OF TWO GENDERS. A CONTENT ANALYSIS OF CIVIL LIABILITY CASES, SUSTAINED ALLEGATIONS & CITIZEN COMPLAINTS (Nat'l Ctr. for Women & Policing 2002), a study finding that the representation of officers in excessive force cases is predominantly male, with corresponding consequences in terms of sustained allegations, citizen complaints, and court judgments and settlements. A later study in 2007 suggests that female officers and same-gender female-female officer pairs are less likely to use physical force than male counterparts in police-citizen encounters. Amie M. Schuck & Cara Rabe-Hemp, Women Police, 16 WOMEN & CRIM.JUST. 91-117 (2007).

[16] The data in Figures 8b and 11b showing New York City's population by gender and race or national origin are included for reference purposes. It should be noted that the breakdown of New York City's population has changed over time. Accordingly, this fact should be taken into consideration when making comparisons between the population data and complainant data for the variables discussed in this Report—race or national origin and gender—as the value of these population statistics as comparators may vary as the ages of the data sets increase. Further, it should also be noted that a person does not need to be a resident of New York City in order to file a complaint with CCRB.

**Figure 7: Gender Composition of Officers Involved in Force Encounters Versus All NYPD Officers[17]**



(7a) Officers Involved in Force Encounter by Gender

(7b) All Uniformed NYPD Officers by Gender

**Figure 8: Gender Composition of Complainants in Force Encounters Versus NYC Population**



(8a) Complainants by Gender

(8b) New York City Population by Gender

[17] The NYPD and New York City gender composition data included in Figure 7b and Figure 8b were obtained from NEW YORK CITY POLICE DEP'T, ANNUAL FIREARMS DISCHARGE REPORT 2013 (2014), http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/nypd_annual_firearms_discharge_report_2013.pdf, and NEW YORK CITY DEP'T OF CITY PLANNING, *Population 2010 Demographic Tables*, NYC.GOV (2014), http://www.nyc.gov/html/dcp/html/census/demo_tables_2010.shtml, respectively. The demographic data were based on the 2010 U.S. Census. It should be noted that the breakdown of NYPD will vary depending on the year. Accordingly, there will be a variance in the value of these data as a comparator as the difference in the age of the data sets increases.

**Figure 9: Race or National Origin of Officers and Complainants Involved in Force Encounters**



Figure 9 illustrates the subject officers' race or national origin as compared to the complainants' race or national origin in the 179 substantiated CCRB cases. Blacks and Hispanics are the most heavily impacted demographic groups from the sample with 57.8% black complainants and 30.3% Hispanic complainants.[18]

---

[18] A person who identifies as Hispanic can be of any race. *See* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM'N, *EEO-1 Instruction Booklet*, EEOC.GOV, app. at 4 (Jan. 2006), *available at* http://www.eeoc.gov/employers/eeo1survey/2007instructions.cfm ("Hispanic or Latino - A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race.").

**Figure 10: Race or National Origin Composition of Officers Involved in Force Encounters Versus All Uniformed NYPD Officers[19]**



**Figure 11: Race or National Origin Composition of Complainants Versus New York City Population[20]**



---

[19] The NYPD and New York City race or national origin composition data included in Figures 10b and 11b were obtained from NEW YORK CITY POLICE DEP'T, CRIME AND ENFORCEMENT ACTIVITY IN NEW YORK CITY (JAN 1 – DEC 31, 2014) (2015), http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/enforcement_report_year_end_2014.pdf. The demographic data were based on the 2013 American Community Survey administered by the U.S. Census Bureau.

[20] Figure 11a does not include one complainant that declined to disclose his/her race or national origin to CCRB.

Case 1:15-cv-01989-KBF   Document 75-17   Filed 05/04/16   Page 22 of 90

As noted in Figure 11a, blacks represent 57.8% of the complainants in the reviewed force cases. This statistic stands in contrast to how blacks are represented across New York City, making up 22.6% of the entire population, as seen in Figure 11b. These statistics are generally consistent with the race or national origin composition of complainants across all forms of alleged police misconduct citywide.[21]

While white officers are more heavily represented than officers of color among the subject officers found to have used excessive or unnecessary force in these substantiated CCRB cases, the race or national origin of officers involved in the substantiated use-of-force cases is generally consistent with the overall demographic composition of NYPD's police force, as seen above in Figure 10b. Though the raw numbers may suggest racial disproportionality regarding the treatment of black complainants by white officers, after evaluating the pool of 179 force cases substantiated by CCRB, OIG-NYPD found no statistically significant relationship between officer race or national origin and complainant race or national origin.[22]

---

[21] See CCRB, APP. A CCRB COMPLAINT DATA 2014 (2015), http://www.nyc.gov/html/ccrb/downloads/pdf/2014-annual-report-stats-appendix.pdf (last visited Sep 10, 2015).

[22] Specifically, OIG-NYPD used a chi square test to determine statistical significance (whether the relationships between officer and complainant race or national origin was random). The results of this test indicate that the relationship between officers and complainants in terms of race or national origin is not statistically significant. Simply put, what was observed is randomly occurring.

## IV.    Tracking Force Incidents Involving NYPD Officers

A critical element to understanding, analyzing, and improving police practices regarding force is having accurate and reliable use-of-force data. A complete accounting of use of force is currently impossible because NYPD lacks a centralized and reliable way to identify and track force incidents, regardless of whether they are justified. While certain sources of data do exist—such as substantiated CCRB use-of-force cases—they are not comprehensive.

NYPD's current inability to track force data is rooted in two core realities. First, the Department's written use-of-force policy does little to clarify the basic question of how to define "force," leaving officers without guidance on what should be reported. Second, the reporting requirements regarding force incidents are not comprehensive. In some instances, there is no obligation to document force at all. Moreover, a review of the cases where reporting was required revealed that officers frequently did not document force in required paperwork in situations where force was used. Also, in instances where documentation was required in multiple places, the officer documented force on some forms but omitted documentation on others.

As previously mentioned, OIG-NYPD is aware that NYPD is potentially revising its policies and procedures in this area involving the tracking and reporting of force incidents.

### a.  The Importance of Reporting and Documenting Force Incidents

Consistent reporting and robust documentation of force incidents are necessary to ensure both transparency and accountability within police departments. Only when officers consistently and accurately report and document the use of force will there be a strengthened review process and an enhanced accountability system.[23]

The Commission on Accreditation for Law Enforcement Agencies (CALEA) recommends that, in order to promote consistent reporting and ensure proper documentation, officers should have to report all force used, even in instances where less than lethal force was applied.[24] Indeed, the use-of-force policies of some police departments first define or illustrate examples of the range of force officers may deploy in the performance of their duties and then mandate that the use of any of the delineated examples of force be reported.[25]

---

[23] "Law enforcement agencies should have comprehensive policies on the use of force that include training, investigations, prosecutions, data collection, and information sharing. These policies must be clear, concise, and openly available for public inspection." U.S. DEP'T OF JUSTICE, FINAL REPORT OF THE PRESIDENT'S TASK FORCE ON 21ST CENTURY POLICING (2015), http://www.cops.usdoj.gov/pdf/taskforce/TaskForce_FinalReport.pdf (last visited Sept. 10, 2015).

[24] COMM'N ON ACCREDITATION FOR LAW ENFORCEMENT AGENCIES (CALEA), STANDARD 1.3.6 REPORTING USES OF FORCE (2008).

[25] See, e.g., LAS VEGAS METRO. POLICE DEP'T, GENERAL ORDER [DIR. NO.] GO- 021-12 (Effective June 22, 2012) (Concerning Use of Force Policy); 2015 SEATTLE POLICE MANUAL, USE-OF-FORCE REPORTING tit. 8.400-POL-1(1) (Effective Sept. 1, 2015); DENVER POLICE DEP'T OPERATIONS MANUAL, Use of Force Policy § 105.0(1)b (Last Updated Apr. 30, 2015).

The U.S. Department of Justice has identified proper documentation and reporting of use of force as an ideal standard of any law enforcement agency and has recommended this protocol to several police departments around the country. For example, under the Seattle Police Department's use-of-force policy, officers are required to "thoroughly document all reportable uses of force to the best of their ability, including a description of each force application."[26]

### b. NYPD's Policies and Practices Regarding Force Reporting and Documentation

According to the 2013 Law Enforcement Management and Administrative Statistics (LEMAS) survey conducted by the Bureau of Justice Statistics, a component of the U.S. Department of Justice, as of January 2013, 65.6% of law enforcement agencies used a special form to document the use of force.[27] By contrast, 27.9% of law enforcement agencies surveyed, including NYPD, responded that they documented force only in arrest reports, thereby largely failing to collect data on use-of-force encounters that did not result in arrests. NYPD's responses to the LEMAS survey also reveal that the Department's policies and practices are lacking with respect to the consistency of definitions for force reporting and the collection of data for all use-of-force incidents.

### i. NYPD Patrol Guide Does Not Define "Force" or Establish Levels of Force

Tracking the use of force by police officers first requires defining what is meant by "force," "excessive force," and "deadly force." When a police department provides clear and practical definitions of such terms, officers have a better understanding of what is expected of them, and communities have a better understanding of what to expect from law enforcement. As previously established, the authority to use force to address a situation is one of the greatest powers that society gives to law enforcement and the exercise of that power can have serious consequences. Accordingly, law enforcement and communities alike must have a consistent understanding of what is meant by "force."

The NYPD Patrol Guide contains no definition of "force." While Patrol Guide §203-11 provides broad principles declaring that force must be limited to what is necessary under the circumstances, the guide does not clarify what actions constitute force. Likewise, although Patrol Guide §203-11 states in highlighted language that "<u>EXCESSIVE FORCE WILL NOT BE TOLERATED</u>," it does not define or clarify what is meant by "excessive force." Finally, while the Patrol Guide contains a separate section on "Deadly Physical Force" with clear, delineated

---

[26] Seattle Police Department's use-of-force policy outlines the elements that must be included in the use-of-force report for each level of reportable use of force. For a full explanation of these levels of force, *see* Appendix B.
[27] U. S. DEP'T OF JUSTICE, OFF. JUST. PROGRAMS, BUREAU JUST. STAT., LAW ENFORCEMENT MANAGEMENT AND ADMINISTRATIVE STATISTICS (LEMAS) 2013, ICPSR36164-v1 (Inter-university Consortium Pol. & Soc. Res. [distributor], 2015), http://doi.org/10.3886/ICPSR36164.v1. http://doi.org/10.3886/ICPSR36164.v1.

instructions on when deadly force is permitted and when firearms use is prohibited, §203-12 does not define what constitutes "deadly physical force."[28]

To some observers, the notions of "force," "excessive force," and "deadly physical force" may be so self-evident that a written definition is redundant and unnecessary. However, close consideration of the issue shows that the terms are not so obvious—indeed different police departments have different definitions—and NYPD needs to clarify its policies. Clear standards and definitions are important to ensuring consistency, predictability, and accountability, even when seemingly obvious.

Giving "force" a practical definition is not as intuitive as it appears at first glance. The Patrol Guide is silent on specifics. For example, an officer is not informed whether shoving or taking a suspect to the ground is a use of force. The Patrol Guide's silence on this issue results in individual officers determining for themselves whether their actions should be reported.

Additionally, NYPD does explain other arguably self-evident terms. The Department has elected to include definitions with respect to "deadly use of force," and the Patrol Guide defines "Professional Judgment" as "judgment based not only upon experience as an individual but taking into account the knowledge, experience, and training gained through employment as a police officer."[29]

Moreover, NYPD has recognized the importance of officers understanding "force" and related terms. Through its various use-of-force training materials, NYPD already defines "deadly physical force" as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury."[30] The lesson plans likewise stress the importance of trainees being able to "define physical force, deadly physical force, physical injury, [and] serious physical injury."[31]

Notably, other police departments include definitions of such terms in their operations materials. Several law enforcement agencies, such as those in Seattle, Miami, Las Vegas, and Denver, have operations manuals that include definitions for deadly force. Some of these manuals limit the force definition to death scenarios (e.g., Denver: "That force, the intended, natural, and probable consequence of which is to produce death and which does, in fact,

---

[28] The entry does not differentiate between actions such as use of a firearm as opposed to a kick to the head, both of which could potentially kill an individual.

[29] 2014 NYPD PATROL GUIDE, DEADLY PHYSICAL FORCE [PROC. NO.] 203-12 (Effective Aug. 1, 2013).

[30] NYPD, POLICE STUDENT'S GUIDE – USE OF FORCE, at 21 (July 2014); NYPD, REINSTATEMENT TRAINING PROGRAM – USE OF FORCE - 15-382-A-000008, at 12.

[31] NYPD, REINSTATEMENT TRAINING PROGRAM – USE OF FORCE - 15-382-A-000008, at 1.

produce death").[32] Others have definitions that refer to both death and serious physical injury (e.g., Miami: "Deadly force: Force that is likely to cause death or serious physical injury.").[33]

Rather than defining "force" as a single term, some police departments provide formal definitions for levels of force less than deadly force. For example, in addition to defining "Deadly Force," the Use of Force General Order of the Las Vegas Metropolitan Police Department (LVMPD) includes definitions for "Non-Deadly Force," "Intermediate Force," and "Low-Level Force." By dividing force into levels, LVMPD is able to provide officers with specific guidance on the types of force that must be reported and those that do not require reporting.[34]

Of the departments surveyed, Seattle employs the most detailed definition of "Force." The Seattle Police Department's manual defines "Force" as "any physical coercion by an officer in performance of official duties," and then provides additional definitions of four levels of force: De Minimis, Type I, Type II, and Type III.[35]

As noted above, NYPD's proposed use-of-force procedures plan to include definitional language regarding what constitutes "excessive force." Any revisions to the use-of-force procedure should provide officers and the public with greater clarity regarding what is meant by "force," "excessive force," and "deadly physical force." This added clarity will aid officers in identifying when force was used, which will in turn lead to more accurate reporting and tracking of force.

### ii. NYPD Lacks a Uniform Policy on Reporting Force Incidents

Improved accountability on use of force requires all officers to understand what force is and when to report it. Once officers understand what force is and when it has been used, they must be able to report it in a way that is both accurate and traceable. Policymakers can then use that information to understand how frequently force is used, how it is being used, and on whom it is being used. Currently, NYPD's reporting procedures are frustrated by a number of systemic problems.

NYPD's reporting procedures and documentation mechanisms on the use of force appear to be fragmented. Unlike the many police departments around the country that have policies requiring the separate documentation of force incidents, such as Seattle and Cleveland, NYPD does not have a separate, centralized, and mandatory use-of-force form for documenting when physical force has been used. Instead, NYPD has a variety of forms and documents that

---

[32] DENVER POLICE DEP'T OPERATIONS MANUAL, *supra* note 25, at 20.

[33] Miami Beach Police Dep't Standard Operating Proc. USE OF FORCE [SOP No.]017 (Effective July 3, 2000, Revised Jan. 12, 2010), *available at* https://cbsmiami.files.wordpress.com/2013/08/use-of-force.pdf.

[34] LAS VEGAS METRO. POLICE DEP'T, GENERAL ORDER [DIR. NO.] GO- 021-12, *supra* note 25, at 20.

[35] SEATTLE POLICE MANUAL, USE OF FORCE DEFINITIONS tit. 8.050 (Effective Sept. 1, 2015), *available at* http://www.seattle.gov/police-manual/title-8---use-of-force/8050---use-of-force-definitions. For a full explanation of these levels of force, *see* Appendix B.

officers are required to complete depending on the incident. This patchwork set of forms—designed to track other information—does <u>not</u> capture the entire universe of force cases.

For example, when force is used pursuant to an arrest, the NYPD arrest report asks officers to note whether force was used. If force was used, the officer can select a specified force option. Officers are also required to follow specific reporting procedures when a firearm is discharged (Patrol Guide §212-29) or when a Conducted Energy Device, also known as a Taser, is used (Patrol Guide §212-117). NYPD policy contains other reporting requirements for other types of force, including certain memo book requirements.[36] This myriad of reporting requirements results in scattered, non-uniform data regarding force incidents.

In addition, Patrol Guide §207-21 obligates all members of service to report "criminal activity or other misconduct of any kind including the use of excessive force or perjury that is committed by member of the service whether on or off duty." This report can be made anonymously to NYPD's Internal Affairs Bureau (IAB). Notably, Patrol Guide §207-21 makes clear that "[f]ailure to report corruption, other misconduct, or allegations of such act is, in itself, an offense of serious misconduct and will be charged as such when uncovered during an investigation."

However, certain types of force evade reporting requirements altogether. For example, police incidents where force is used and no arrest is made may not necessarily trigger a reporting requirement. As a result, NYPD does not have adequate data on the full universe of force incidents.

### iii. NYPD Force Reporting Is Inconsistent in Practice

Considering the diverse yet deficient reporting requirements that currently exist, coupled with the fundamental lack of definition regarding what conduct constitutes "force" and "excessive force," NYPD officers are left with little guidance on how to report force incidents. Consistent with these observations, OIG-NYPD's review of the 179 substantiated CCRB force cases revealed that officers did not always document when force was used and, when force was documented, the paperwork was often either inadequate or inaccurate.[37] As noted previously, NYPD policies require officers to report only <u>certain</u> force incidents. In the cases reviewed, there was a total of 207 substantiated allegations of force. Among the cases where officers <u>did</u> report force, the force was documented on various forms including:

---

[36] The NYPD Patrol Guide requires that officers record in their activity log "[i]nformation pertinent to an assignment or observed/suspected violation of law, i.e., action taken narrative disposition, forms prepared with identifying serial number, etc. . . ." 2014 NYPD PATROL GUIDE, ACTIVITY LOGS [PROC. No.] 212-08 (Effective Aug. 1, 2013).

[37] As noted above, substantiated cases are a small subset of the total number of complaints made to CCRB.

- Arrest Report;
- UF250 (Stop and Frisk Report);
- Memo Book;
- Command Log;[38]
- Conducted Energy Device (CED) Discharge Report;
- Firearms Discharge Report;
- Juvenile Report;
- UF49 (Unusual Occurrence Report);
- AIDED Report.[39]

In cases where officers did document the use of force, they often employed generic language such as "hands on suspect," "forced victim against wall," and "force was used in handcuffing complainant in order to overcome resistance." Also, rather than clearly articulating the type, nature, and seriousness of the resistance posed by the citizen that led to the use of force, officers tended to use conclusory language such as, "force used to overcome assault," "victim attempted to assault detective," and "the detective used the minimal amount of force to subdue and restrain the defendant."

In many of these cases, such as those resulting in arrests, documentation of force was required. A particularly troubling pattern uncovered during OIG-NYPD's review was the inaccurate documentation of force. NYPD's arrest report has a section that requires officers to indicate whether force was used ("yes" or "no") and the type of and reason for such force. In 54 out of 108 instances where arrests were made, or 50.0% of the time, the officer who completed the arrest report affirmatively reported that force was not used. In 39 of these 54 instances, the officer completing the report was not the person who used the force, and may not even have been present at the scene, and therefore may have been unable to detail the nature of the force used and/or why it was used. However, there were also 15 instances where the arresting officer was the subject officer and documented that force was not used, even though CCRB later substantiated the use of excessive force by that officer. Whether these officers intentionally misrepresented the force event or reasonably believed that "force," an undefined term, was not used cannot be determined from the case files alone. Nevertheless, OIG-NYPD's analysis further underscores the need for policies that provide clear guidance about what constitutes force and how force must be reported.[40]

The myriad of reporting obligations, along with the lack of a separate use-of-force form and a centralized system of collecting data on the use of force by officers, contributed to a lack

---

[38] **NYPD Command Logs** are ledgers located behind the desk of a precinct stationhouse. Command Logs document the daily changes in prisoners, property, and personnel for the stationhouse.

[39] **AIDED Reports** are completed whenever an individual, whether it be a member of the public (except prisoners) or an NYPD officer, is injured during an incident involving the police and receives medical attention.

[40] OIG-NYPD has provided NYPD with a list of the 15 officers noted above with recommendations for further review as appropriate.

of uniformity in the forms officers were using to report force. In some instances, officers were documenting the use of force on some forms, but omitting it on others, leading to a pattern of inconsistency. In other instances, the use of force was not documented anywhere whatsoever. Moreover, NYPD's deficient reporting and documentation processes arguably hampered CCRB's ability to fully investigate force cases by rendering it difficult to determine how much force was used and why, potentially resulting in a high number of unsubstantiated cases.[41]

### c. The Need for Uniform Force Reporting and Documentation

To help ensure better accountability, NYPD must develop clear policies that require the documentation of use of force by all officers involved in an incident. Such policies must provide sufficient guidance to officers on how to report force and what information the report must contain, including a requirement that officers specify, with particularity, the kind of force used and the resistance they may have encountered.

A separate use-of-force form would capture the salient and relevant details of an encounter in a comprehensive and thorough manner. The form should record what injury, if any, was sustained by the citizen as a result of the force used and should also document the identities of all other officers at the scene of the force incident. Adopting a separate use-of-force form will improve the internal and external review processes for force incidents. Because NYPD lacks a dedicated use-of-force form, it is likely that force encounters are currently being underreported.

In documenting use of force, officers should articulate the "type, nature, and seriousness of resistance exhibited by the [citizen] that preceded the use of force."[42] Vague or generic language that does not describe with sufficient particularity the level and type of force used must be avoided in order to allow for proper review and assessment. Officers should also avoid descriptions of force incidents without referencing whether other officers used force or the timing of the use of force.[43]

In addition to improving data collection and promoting police accountability, a uniform and standard use-of-force form would also assist supervisors in carrying out their important functions in the Department. Under Patrol Guide §206-01, supervisors are under a duty to "report violations observed . . . to commanding/executive officers for corrective action."

---

[41] Between 2010 and 2014, CCRB unsubstantiated 2,914 (28.0%) force allegations. The remainder consisted of 4,583 (44.0%) exonerated, 1,554 (14.9%) unfounded, 1,038 (10.0%) officer unidentified, and 123 (1.2%) miscellaneous force allegations. *See* CCRB, *supra* note 1, at 2.

[42] Letter from Jonathan M. Smith, Chief Special Litigation Section, U.S. Dep't of Justice C.R. Div., to Michael McGinn, Portland Mayor, Portland 15 (Dec. 16, 2011) (regarding Seattle Police Department Civil Rights Pattern or Practice Investigation), *available at* http://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_findletter_12-16-11.pdf (last visited Aug 27, 2015).

[43] *Id.*

Supervisors are required to prepare a report "[u]pon observing or becoming aware of a violation of the rules or procedures by a member of the service."

Similarly, a review of other police departments showed that supervisors in those departments are likewise responsible for ensuring that their subordinate officers properly document and report all force used and are also responsible for initially assessing the officers' compliance with departmental procedures. Uniform use-of-force reporting mechanisms would assist supervisors in ensuring that officers understand their reporting obligations and are complying with necessary procedures. Information from these forms will also serve as a useful tool for NYPD to collect data and identify officers for training and other non-disciplinary mechanisms through Early Intervention Systems.[44]

Moreover, several cases among those reviewed by OIG-NYPD involved injuries to officers. A more comprehensive use-of-force reporting mechanism could be useful in identifying improved safety protocols and equipment.

Finally, collecting, analyzing, and publishing all aspects of data pertinent to use of force are also integral to gaining a better, more comprehensive understanding of the issue and improving corresponding policies and procedures.

---

[44] For an introduction to Early Intervention Systems, please see OIG-NYPD's April 2015 report, USING DATA FROM LAWSUITS AND LEGAL CLAIMS INVOLVING NYPD TO IMPROVE POLICING 7-11 (2015), available at http://www.nyc.gov/html/oignypd/assets/downloads/pdf/2015-04-20-litigation-data-report.pdf.

## V.   Force De-Escalation Policies and Practices in NYPD

As recognized in New York City and across the nation, de-escalation policies and tactics have the potential to greatly mitigate the use of excessive force by police officers. De-escalation tactics have a proven track record of not only limiting force, but also ensuring officer safety. As recently summarized by the U.S. Department of Justice:

> De-escalation more broadly refers to the strategic slowing down of an incident in a manner that allows officers more time, distance, space and tactical flexibility during dynamic situations on the street. Applying these specific skills increases the potential for resolving the situation with minimized force or no force at all, which reduces the likelihood of injury to the public, increases officer safety and mitigates the immediacy of potential or ongoing threats. A reduction in use-of-force incidents also reduces community complaints, promotes the perception of procedural justice and, most importantly, promotes resolution of events with the public's compliance.[45]

OIG-NYPD's investigation suggests that NYPD officers rarely use de-escalation and that the Department's policies and training currently do not adequately address de-escalation as a useful tactic for officers in the field.

As previously mentioned, NYPD is currently contemplating potential revisions to its de-escalation policies and procedures.

### a.  De-Escalation in the Field: Missed Opportunities by NYPD Officers

In addition to recording and compiling statistical data on the 179 substantiated CCRB force cases, OIG-NYPD designated a specialized team consisting of employees with professional backgrounds in law enforcement and police oversight to conduct a case-by-case review of each CCRB substantiated allegation with a focus on the use of de-escalation tactics. This team based their analysis on the contents of the relevant CCRB investigative files (including first-hand evidence, such as video footage) and tracked criteria such as:

- Whether the complainant physically resisted the officers in any way;
- Whether any use of force was necessary to achieve a legitimate aim;
- Whether the force used was proportionate to the circumstances;
- Whether the use of force was objectively reasonable; and
- Whether de-escalation techniques could have been deployed as an alternative.

---

[45] USAO - W. DIST. WA, *Justice Department Applauds Adoption of Police Department-Wide Tactical De-Escalation Training Program in Seattle*, U.S. DEP'T OF JUSTICE (Apr. 16, 2015), http://www.justice.gov/usao-wdwa/pr/justice-department-applauds-adoption-police-department-wide-tactical-de-escalation (last visited Sept. 10, 2015).

OIG-NYPD's review of the CCRB cases found that officers too often did not de-escalate encounters, failed to intervene in encounters where other officers used excessive force against members of the public, and escalated encounters themselves.

Officer interactions with members of the public are fluid, often unpredictable situations where officers sometimes have to be mindful of many factors and are called upon to make split-second decisions. There is no one-size-fits-all approach, and whether officers should deploy force or use de-escalation tactics is a question that depends on the unique circumstances of the case. That said, after conducting an individual review of the CCRB case files, OIG-NYPD investigators determined that in dozens of incidents, officers were presented with the opportunity to de-escalate the situation but ultimately did not. This observation is limited to the 179 cases where CCRB substantiated the use of force, and officers may be using de-escalation tactics in other, unreported incidents. Nevertheless, OIG-NYPD's analysis reveals that in cases where force was used, such use of force arguably could have been prevented through de-escalation.

---

**Substantiated CCRB Case Study: Could De-Escalation Tactics Have Been Used to Prevent a Force Encounter?**

*At approximately 2:40 a.m. in Manhattan, a 45-year-old male complainant walked out of his apartment to take out the trash and locked himself out of the building.*

In the video footage of the encounter, the man can be seen speaking to two officers as he attempts to explain his predicament. The subject officer walks away toward the entrance of the apartment building as the complainant continues speaking with the second officer. The man is visibly frustrated by the situation and is waving his hands around as he speaks.

According to the CCRB investigative report, the subject officer stated that he smelled alcohol on the complainant's breath and did not believe that he was a resident of the building. When the officers asked the man for identification, he replied that he did not have it. The man further stated that he had locked himself out of his apartment. The subject officer told the complainant that he could not enter the building and that he had to leave because he did not have identification. The subject officer told CCRB that he then asked the complainant to leave three times, and that each time the man responded that he lived in the building.

The video shows the complainant and the subject officer in a heated conversation when the subject officer begins yelling and pointing his finger in the man's face. The subject officer then aggressively pushes the complainant to the ground. The subject officer walks over to the complainant while he is lying on the ground and continues to yell and point his finger at him.

---

The second officer failed to intervene when the subject officer initially lost his temper and stood several feet away with his hands in his pockets. The second officer remained passive and did nothing to intervene or take control of the situation, even once the complainant was on the ground and the subject officer continued to yell at him.

CCRB substantiated the force allegation against the subject officer and he ultimately received a Command Discipline.

**Substantiated CCRB Case Study: Could De-Escalation Tactics Have Been Used to Prevent a Force Encounter?**

*At approximately 12:50 a.m. in Manhattan, a 15-year-old male complainant was walking on the sidewalk when he was approached by two officers.*

In the audio recording of the encounter, the subject officer initially appears to be the only person speaking to the boy. Moments later, however, a second officer also engages the complainant. The boy protests having been stopped and mentions that the stop was his second in just two blocks.

According to the CCRB investigative report, the subject officer searched the complainant. When the boy objected that there was no cause for the stop, the subject officer asked him to stop using derogatory language and informed him that if he did not comply, he would be arrested.

The audio indicates that the complainant and the subject officer are engaged in a heated conversation during which the subject officer is taking exception to the boy protesting the rationale for the stop. Each time the complainant speaks, it appears to intensify the ensuing verbal responses of both officers. A scuffle ensues between the subject officer and the boy which results in the subject officer pushing him repeatedly.

CCRB substantiated the force allegation against the subject officer, but he ultimately received no discipline.

Among the 179 CCRB cases, OIG-NYPD also identified a substantial number of encounters where a bystander officer or witness officer who was not the subject officer in the force complaint was present and, based on the evidence in the CCRB case file, could have intervened and potentially prevented the use of force. Despite such opportunities, however, bystander officers intervened in very few instances. Patrol Guide §203-11 states that "[m]embers of the service are required to maintain control or intervene if the use of force against a subject clearly becomes excessive. Failure to do so may result in both criminal and civil liability." The cases reviewed by OIG-NYPD underscore the need to train officers to intervene in situations where they witness fellow officers engaging in excessive force.

---

**Substantiated CCRB Case Study: Failure of Officers to Intervene**

*At approximately 9:00 p.m. in Queens, a 26-year-old male complainant was riding his bicycle on the sidewalk when he was approached by four officers.*

In the video footage of the encounter, the subject officer initially appears to be the only person speaking to the complainant. The complainant is visibly angry, waving his hands about and moving around the sidewalk with the three other officers flanking him.

According to the CCRB investigative report, the subject officer had asked the man for identification. The complainant said he did not have it. The subject officer then asked him to provide his name, and when the man refused to do so, the subject officer informed him that he would be arrested if he did not comply.

The video shows the complainant and the subject officer in a heated conversation when the subject officer punches the man in the face four times. The subject officer then bends down and pulls out the complainant's legs from beneath him, causing him to fall backwards onto the sidewalk. The subject officer then delivers another two punches to the man while he is on the ground.

Throughout the entire encounter, one of the four officers has been standing to the side observing the interaction. This officer does not intervene after the first, second, third, or fourth strike to the complainant's face, and he does not even move. The officer stands passively, a few feet away, with his thumbs hooked in his belt. Only once the man is on the ground and has been struck a fifth and sixth time does that officer approach, place one hand on the subject officer's back, and appear to intervene halfheartedly.

CCRB substantiated the force allegation against the subject officer. The other officers' force allegations were exonerated by CCRB. At the time of the writing of this Report, no disciplinary decision has been reached in this case, despite the matter being in the NYPD disciplinary process for the past seven months.

---

Although officer encounters are fluid and the viability of de-escalation tactics may be driven by several factors, the use of force is a serious undertaking and responsibility. Officers should avoid affirmatively escalating situations when officer safety is not at risk. OIG-NYPD's analysis of the 179 CCRB cases also determined that in 26 instances, or 14.5% of the time, officers actually escalated the situation at hand. Examples of such behavior include, but are not limited to, the use of incendiary language, making unnecessary physical contact, and drawing weapons at inappropriate times.[46]

---

**Substantiated CCRB Case Study: Force Escalated by Officer**

*At approximately 11:00 p.m. in the Bronx, a male complainant was standing within a few feet of three officers and two other men, recording their interaction on his cell phone.*

In the video footage of the encounter, the subject officer appears to be assisting two other officers in restraining two combative men in front of the entrance to a building.

According to the CCRB investigative report, the subject officer stopped the men because he suspected they were drinking alcohol in public. When the subject officer approached, he asked the men what they were doing and where they lived. The subject officer then asked them to provide identification, and when they refused to do so, the three officers began to place the men in handcuffs.

The video shows the complainant approaching the officers as they are attempting to place the two other men in handcuffs. The complainant is holding his cell phone with two hands in an attempt to record the interaction between the officers and the men. When the subject officer realizes that the complainant is standing nearby, the subject officer violently swings his right arm towards the complainant's cell phone, then draws and points his firearm at the complainant and uses profanity and racial epithets while aggressively commanding the complainant to put away the phone.

CCRB substantiated the force allegation against the subject officer. No other force allegations were made against the other officers. Discipline was not imposed in this case because the statute of limitation expired before CCRB forwarded the case to NYPD for disciplinary disposition.

---

[46] OIG-NYPD has provided a list of these 26 officers to NYPD with recommendations for further review as appropriate.

**Substantiated CCRB Case Study: Force Escalated by Officer**

*At approximately 10:30 p.m. in Queens, a male complainant was standing outside a shopping center with a second male complainant and another man when the first complainant interacted with an off-duty officer who was entering the premises.*

In the video footage of the encounter, the first complainant is seen standing outside the shopping center when the off-duty subject officer approaches and appears to lightly shove his way through the path of the complainants and the other man. As the officer enters the shopping center, the first complainant can be seen standing outside making a hand gesture with his arms stretched out at his sides to reflect that he was upset by the subject officer's shove. A clear exchange of words ensues between the first complainant and the subject officer. As the exchange continues, the subject officer can be seen turning around and walking back towards the door of the shopping center to confront the first complainant. While doing so, the subject officer lifts his shirt to reveal his shield and service weapon and unclips an object from the waistband of his shorts. When the subject officer approaches the first complainant, he pushes the first complainant with two hands, causing him to move several feet back. Additionally, the subject officer strikes the second complainant with the object in his right hand. The subject officer is then seen walking away from the men and re-enters the shopping center.

According to the CCRB investigative report, the subject officer believed that the men standing in front of the shopping center appeared suspicious and were blocking the entrance. The subject officer denied pushing the first complainant and told CCRB that as he attempted to enter, the first complainant advanced in his direction. As a result, the subject officer stretched his arms out to keep him at a distance.

CCRB substantiated the two force allegations against the subject officer. At the time of the writing of this Report, no disciplinary decision has been reached in this case despite the matter being in the NYPD disciplinary process for the past 20 months.

As these examples show, NYPD officers are not only missing opportunities to de-escalate, but are sometimes actively escalating situations with members of the public, thereby suggesting that the Department may not effectively promote the use of de-escalation tactics in the field. The solution to this issue lies in both policy and training.

### b. NYPD's De-Escalation Policies: Areas for Improvement

Core to any de-escalation program is the de-escalation policy. In addition to training and promoting a culture around de-escalation, a clearly written policy is needed to inform members of a police department of the rules, parameters, and principles that guide police officer conduct during encounters with the public. Written policies have the opportunity not only to inform officers about the role and benefits of de-escalation in such encounters, but also to educate officers on specific de-escalation tools and tactics.[47]

### i. NYPD Patrol Guide

While NYPD has recently refocused its efforts on providing officers with de-escalation training, the NYPD Patrol Guide remains relatively silent on de-escalation tools and on an officer's responsibility with respect to de-escalation tactics.

As noted above, the core use-of-force provision of the Patrol Guide requires that officers use only the amount of force necessary to address the situation. Patrol Guide §203-11 stresses that officers only "use minimum necessary force" and "[e]mploy non-lethal alternatives, as appropriate." Patrol Guide §203-11 also includes prohibitions against certain forms of excessive force, such as chokeholds, conduct that may result in chest compressions, and dangerous forms of restraint. Consistent with these prohibitions, the Patrol Guide notes that "[m]embers of service are required to maintain control or intervene if the use of force against a subject clearly becomes excessive."[48]

The Patrol Guide articulates a policy on the need for the application of force to be proportional to the circumstances and imposes an affirmative duty on officers to prevent the unnecessary escalation of force when it appears excessive. However, it does not articulate a policy on the importance of <u>reducing</u> the likelihood that force is needed in a given situation.

### ii. Model Practices

Several police departments across the country have revised their use-of-force policies to incorporate de-escalation concepts. These range from statements of principle that remind officers of the importance of de-escalation to firm requirements that oblige officers to de-escalate the situation when appropriate.

For example, PPD Directive 10 of the Philadelphia Police Department begins its section on use of force with the following goal:

*A. GOAL: To always attempt to de-escalate any situation where force may become necessary. In the event force becomes unavoidable, to use only the minimal.*

---

[47] "Law enforcement agency policies for training on use of force should emphasize de-escalation and alternatives to arrest or summons in situations where appropriate." U.S. DEP'T OF JUSTICE, *supra* note 27, at 21.
[48] 2014 NYPD PATROL GUIDE, USE OF FORCE [PROC. NO.] 203-11 (Effective Aug. 1, 2013).

> B. The amount of force, the continued use of any force, and the type of
> police equipment utilized all depend upon the situation being faced by the
> officer. However, once the threat has been overcome or a subject is securely
> in custody, it is an officer's responsibility to de-escalate and immediately
> address any injuries the suspect may have sustained.[49]

Other large city police departments likewise have guidelines that remind
officers of the role that de-escalation can play. For example, the use-of-force policy
in Denver states:

> Policing requires that at times an officer must exercise control of a violent,
> assaultive, or resisting individual to make an arrest, or to protect the officer,
> other officers, or members of the general public from risk of imminent harm.
> Officers may either escalate or de-escalate the use of force as the situation
> progresses or circumstances change.[50]

By contrast, some use-of-force policies require that officers actively take steps to de-
escalate the situation when appropriate. For example, the Seattle Police Department (SPD)'s
use-of-force policy notes the following:

> **1. When Safe under the Totality of the Circumstances and Time and
> Circumstances Permit, Officers Shall Use De-Escalation Tactics in Order to
> Reduce the Need for Force.**
>
> De-escalation tactics and techniques are actions used by officers, when safe
> and without compromising law enforcement priorities, which seek to
> minimize the likelihood of the need to use force during an incident and
> increase the likelihood of voluntary compliance.
>
> When safe and feasible under the totality of circumstances, officers shall
> attempt to slow down or stabilize the situation so that more time, options
> and resources are available for incident resolution.[51]

---

[49] Phila. Police Dep't, USE OF FORCE – INVOLVING THE DISCHARGE OF FIREARMS [DIR.] 10 (Effective May 23, 2014)

[50] DENVER POLICE DEP'T OPERATIONS MANUAL, *supra* note 25, at 20.

[51] SEATTLE POLICE MANUAL, USING FORCE tit. 8.200-POL-1(1) (Effective Sept. 1, 2015), *available at*
http://www.seattle.gov/police-manual/title-8---use-of-force/8100---de-escalation; *see also* Chi. Police Dep't, USE OF
FORCE MODEL [GEN. OR.] G03-02-01, *available at* http://directives.chicagopolice.org/lt2015/data/a7a57be2-128ff3f0-
ae912-8fff-44306f3da7b28a19.html, ("When force is applied, a member will escalate or de-escalate to the amount
of force which is reasonably necessary to overcome the subject's resistance and to gain control.").

SPD has confirmed that this policy imposes a requirement on officers, under certain circumstances, to attempt to de-escalate the situation before resorting to force.[52] Significantly, SPD's policy regarding de-escalation is *separate from and precedes* the policies on general use of force and deadly use of force, suggesting that de-escalation should be considered by officers before they begin to consider deploying any level of force.

The U.S. Department of Justice (DOJ), which regularly reviews uses of force by police departments across the nation, has consistently found fault with law enforcement failures to de-escalate situations that resulted in excessive force and has identified the need for effective de-escalation policies and training.[53] In 2001, DOJ published *Principles for Promoting Police Integrity* (*Principles*), which notes that, "[d]epending on the circumstances, officers may find it necessary to escalate or deescalate the use of force by progressing up or down the force continuum." *Principles* likewise noted, "Where nondeadly force is authorized, officers should assess the incident to determine which nondeadly technique or weapon will best de-escalate the incident and bring it under control in a safe manner."[54]

Coupled with training and a shift in policing culture, written policies allow police departments to articulate principles, establish requirements, and set expectations of police officers. Considering NYPD's stated commitment to de-escalation training, the overall benefits of de-escalation strategies in policing, and the strides that have been made in updating the policies of other peer police departments, NYPD should include de-escalation principles as part of its use-of-force procedures in the Patrol Guide.

To ensure that police officers consider the full range of options during encounters with the public, the Use of Force policy in the NYPD Patrol Guide should not only identify the level of force permitted in various scenarios, but should also require officers to take steps to reduce the likelihood that force will be needed in the first place. NYPD's policy should include clear language regarding an officer's obligation to de-escalate, such as that used by SPD: "When safe under the totality of the circumstances and time and circumstances permit, officers shall use de-escalation tactics in order to reduce the need for force."

---

[52] FIFTH SEMIANNUAL REPORT JUNE 2015 at 13 (2015), http://static1.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/557f3f8fe4b0e62e4460ff9b/143440270341 9/Fifth+Semiannual+Report.pdf (last visited Aug 27, 2015).

[53] *See e.g.*, U.S. DEP'T OF JUSTICE, INVESTIGATION OF THE FERGUSON POLICE DEPARTMENT ( 2015); Letter from Vanita Gupta, Acting Assistant Attorney General, U.S. Dep't of Justice Civ. R. Div., to Frank G. Jackson, Cleveland Mayor, Cleveland (Dec. 4, 2014) (regarding the Investigation of the Cleveland Division of Police).; Letter from Thomas E. Perez, Assistant Attorney General, U.S. Dep't of Justice C.R. Div., to Manuel Orosa, Miami Police Chief (July 9, 2013)(regarding the Investigation of City of Miami Police Department); ; U.S. Dep't of Justice, INVESTIGATION OF THE NEWARK POLICE DEPARTMENT (July 22, 2014); Letter from Thomas E. Perez, Assistant Attorney General, U.S. Dep't of Justice C.R. Div., to Sam Adams, Portland Mayor, Portland (Sept. 12, 2012)(regarding the Investigation of the Portland Police Bureau).; Letter from Jonathan M. Smith, *supra* note 42, at 26 (regarding Seattle Police Department Civil Rights Pattern or Practice Investigation).

[54] U.S. DEP'T OF JUSTICE, PRINCIPLES FOR PROMOTING POLICE INTEGRITY at 4 (January 2001).

### Seattle Police Department's Use of Force Policy

In December 2011, the Civil Rights Division of the United States Department of Justice (DOJ) published the results of a nine-month investigation of the Seattle Police Department (SPD). DOJ found that SPD had engaged in a pattern or practice of excessive force that violated the U.S. Constitution and federal law. The investigation concluded that "deficiencies in SPD's training, policies, and oversight with regard to the use of force contribute to the constitutional violations."

The City of Seattle (the City) eventually settled with DOJ, and the Consent Decree became an enforceable order of the Court in July 2012. The Consent Decree required sweeping reforms of SPD's use-of-force policies, practices, and training.

By December 2013, the City, DOJ, and the Seattle Police Monitor had agreed on a final draft of the use-of-force policies, which were then approved by the federal court overseeing the decree. The new use-of-force policy included a number of changes and additions to SPD.[55] The Consent Decree:

- Established that officers must accomplish the police mission with the cooperation of the public as effectively as possible, with minimal reliance upon the use of physical force;

- Required the use of de-escalation tactics and techniques;

- Determined that the force used must be objectively reasonable and necessary under the circumstances, and proportional to the threat or resistance of a subject;

- Acknowledged that the conduct of officers prior to the need to use force will be weighed as a factor when SPD assesses any use-of-force incident;

- Clearly defined force, when force was appropriate, when force is prohibited, and when and how to report force;

- Defined and enhanced responsibilities for supervisors and created the Force Investigation Team, an independent team to investigate officer-involved shootings, in-custody deaths, and serious assaults on officers;

- Created the Use of Force Review Board to review all Type II and Type III use-of-force incidents; and

- Created procedural manuals to provide guidance on using non-lethal force devices.

---

[55] SEATTLE POLICE MONITOR'S THIRD SEMIANNUAL REPORT, *U.S. v. Seattle,* No. C12-1282JLR (W.D. Wash.) (Trial Filing) (2015)(No. 154), *available at* http://static1.squarespace.com/static/5425b9f0e4b0d66352331e0e/t/542ae579e4b06a3cb8b707db/1412097401712/Third_Seattle_Police_Monitor_s_Third_Semiannual_Report_dated_June_16_2014.pdf (last visited Aug 27, 2015).

Then Acting Assistant Attorney General Jocelyn Samuels, head of DOJ's Civil Rights Division, hailed the policy as "a use of force policy that will serve as a model for police departments nationwide" and declared that "[t]his policy will help ensure that the people of Seattle have a police department that respects the Constitution, secures the safety of the public, and earns the confidence of the community." [56]

---

[56] USAO - W. DIST. WA, *DOJ Hails Milestone in Seattle Police Department Reform Efforts with Court's Approval of New Use of Force Policy*, U.S. DEP'T OF JUSTICE (Dec. 17, 2013), http://www.justice.gov/usao-wdwa/pr/doj-hails-milestone-seattle-police-department-reform-efforts-court-s-approval-new-use (last visited Sept. 10, 2015).

## VI.  NYPD Training

### a.  The Importance of Training

NYPD's Patrol Guide procedures are an important guide for officers, but are essentially incomplete without a proper training mechanism to complement them. While the Patrol Guide provides officers with direction on what they can and cannot do, training instructs officers on the more practical aspects of their jobs. NYPD's training program is comprised of two main components: a police academy for recruits and in-service courses for sworn members of service. As noted below, while de-escalation tactics are introduced during NYPD training, more focused training is required.

### b.  NYPD Training Overview

#### i.  Police Academy Education and Training Center

The centerpiece of NYPD's training program is the Police Academy Education and Training Center (the Academy), located in College Point, Queens. All new NYPD officers attend the Academy, which is a six-month training program broken into three trimesters, with exams following each trimester.[57] Each day, recruits spend four-and-a-half hours in the classroom and two-and-a-half hours in the gym. NYPD's upcoming recruit class, scheduled to begin training in October 2015, will have 700 recruits.[58]

The Academy's classroom curriculum consists of 53 courses that are divided into three categories: Legal Studies, Humanities, and Police Studies. There are 19 courses in the Legal Studies section of the curriculum for a total of 136.5 hours, 16 courses in the Humanities section of the curriculum for a total of 199.5 hours, and 18 courses in the Police Studies section of the curriculum for a total of 132 hours.

##### 1.  Academy Courses Relevant to Use of Force

OIG-NYPD identified only one nine-hour Academy course, entitled "Use of Force," that directly pertains to officers' use of force. The Academy curriculum also includes another four-and-a-half-hour course, entitled "Policing Professionally," that features alternative strategies to using force, but only indirectly addresses use-of-force or de-escalation tactics. OIG-NYPD also reviewed seven additional courses from the Academy's curriculum that make passing mention of use of force.[59]

---

[57] According to the interviewed Academy staff, recruits must score a 75% or higher on the exams to pass.
[58] NYPD traditionally had two classes per year, but is now moving to four classes per year.
[59] The additional courses reviewed were: "Policing a Multicultural Society," "Policing Impartially," "Authority and Ethics," "Discretion," "Community Interaction and Problem Solving," "Mental Illness," and, "Policing the Emotionally Disturbed."

The goal of the Academy's "Use of Force" course is to train officers to differentiate between the various physical force options available to them. The training is also meant to prepare officers to explain how the force used was reasonable, based on a totality of the circumstances. The course teaches officers to determine the amount of force that they are permitted to use in a given situation, taking into account both the general nature of the situation they are confronting and the danger presented to the officer.

The Academy's "Policing Professionally" course concentrates on officers' communication with the public and demonstrates skills they can use to effectively gain voluntary compliance. Among the topics covered are what it means to be professional; explanations of discretion, effective communication/actively listening, and perception; various NYPD "street clichés"; and an overview of the various agencies that address police misconduct, such as CCRB. Policing Professionally is the only part of the recruit Academy curriculum that emphasizes how officers can de-escalate situations, teaching the recruits to maintain control of their emotions, use verbal and nonverbal communication including active listening, and be assertive, as opposed to confrontational or aggressive. The course also includes a "Five Step Appeal Process" comprised of:

1) an ethical appeal;
2) a context/rational appeal;
3) a personal appeal;
4) a practical appeal; and
5) an involuntary appeal.

Officers are meant to progress through the appeal stages with the goal of gaining voluntary compliance, but the final stage, involuntary appeal, acknowledges that they must take police action if that cannot be accomplished.

## 2. Scenario/Simulation (Firearms and Tactics)

After completing the initial classroom portion of their studies, NYPD recruits begin a 15-day course called "Firearms and Tactics" which takes place both at the Academy and at an NYPD facility at Rodman's Neck in the Bronx. As part of the Firearms and Tactics training, recruits receive instruction in firearms safety, fundamentals of shooting, weapons maintenance, pepper spray usage, and various tactical maneuvers.[60] Recruits are evaluated by a marksmanship exam on which they must score a 78% to pass and a written exam that focuses on pepper spray and exertion. All officers who fail the marksmanship exam are permitted up to four requalification attempts.

In each scenario, recruits respond to a call at a location and then interact with the various instructors who pose as members of the public involved with the incident. When the

---

[60] Lessons in tactical maneuvers include: reflexive responses, close combat training, vehicle cover and concealment, low light training/flashlight techniques, fluid force drills, threat recognition drills, and barricade drills.

scenarios conclude, instructors assess the recruits' performance by first asking the participating recruits and then the observing recruits for their feedback, and then by subsequently pointing out their errors and advising them on the safest, most efficient ways to manage the incidents in question.

In early 2015, OIG-NYPD investigators attended portions of the Firearms and Tactics program and observed officers participating in scenario and simulation-based exercises. At the time, these hands-on exercises made up only a small percentage of the recruits' entire training (three out of approximately 180 days). NYPD has informed OIG-NYPD that the Department has recently adopted a more scenario-focused training model, which features hands-on training after each week of Academy instruction.

The scenario exercises take place at the Academy's mock environment area, which is made up of multiple staged areas meant to replicate locations around the city, such as an apartment, a bar, an ATM vestibule, and a subway car.

### ii.    In-Service Training

In addition to NYPD's Academy training program for recruits, the Department offers a suite of in-service training classes for active members of service. Some in-service training modules are meant for officers sent back to the Academy to work on certain skills or abilities, while others are Department-wide courses. In-service training also includes re-qualifying for shooting, which all officers must do twice a year.[61]

The most recent of NYPD's training programs for in-service officers is the "Smart Policing (20K) Initiative," (Smart Policing) which was largely conceived in response to the death of Eric Garner in July 2014. The "Smart Policing (20K) Initiative" is a three-day program meant to refresh and reeducate approximately 26,000 active officers. OIG-NYPD investigators sat in on the full training program.

The first day of Smart Policing, "NYPD Blue Courage: Safe Policing for Officers and the Public," focuses on what NYPD refers to as "procedural justice."[62] Procedural justice "emphasizes treating citizens fairly and with respect," and is centered on four key principles:

1) fairness and consistency of rule application;
2) impartiality and unbiased decision-maker neutrality;
3) citizen voice in decision-making; and
4) transparency and openness in process.[63]

---

[61] The largest pool of officers sent back for re-training has five to seven years of experience.
[62] ADVANCEMENT PROJECT, LIMITING POLICE USE OF FORCE: PROMISING COMMUNITY-CENTERED STRATEGIES 14, 21-22 (PolicyLink 2014).
[63] Id. at 14.

Case 1:15-cv-01989-KBF Document 75-17 Filed 05/04/16 Page 45 of 90

On the second day of Smart Policing, instructors note that NYPD is the most restrained major police department in the country in the use of force. Officers are then instructed on crisis and conflict communication, and gaining voluntary compliance in non-violent but non-cooperative situations. Instructors list skills linked to these tactics, such as:

- de-escalation;
- active listening;
- time management;
- building empathy/rapport; and
- using influence.

The third day of the Smart Policing course is geared towards refreshing and re-training officers on basic defensive tactics. The presentation features instructors demonstrating various hand-to-hand techniques in front of the class, followed by officers practicing the maneuvers themselves. The instructors also review how to perform a proper arm bar in accordance with NYPD policy and have officers practice the move with a partner.[64] Following the arm bar training, officers practice techniques for falling to the ground with minimal impact and defending themselves once on the ground.

Since first implementing the program in December 2014, NYPD has modified and redesigned it, taking account of feedback and making changes, such as adding midnight training sessions for officers assigned to late-night tours.

OIG-NYPD believes that additional training personnel and increased funding for the Academy would improve the quality and effectiveness of NYPD training, as well as permit the Academy to increase the number of officers trained each year.

### c. Model Practices for De-Escalation Training

OIG-NYPD reviewed the Seattle Police Department's (SPD's) de-escalation training as that department is recognized for having one of the most developed de-escalation policies in the country.[65] As of December 2014, all SPD officers had undergone a 32-hour, in-class training on new use-of-force policies, which included a four-hour course called, "Tactical De-Escalation", at least eight hours of live training on how officers should deal with people in behavioral crises, and eight hours of training on stops, detentions, and bias-free policing.[66] A fuller description of SPD's de-escalation training is available in Appendix C.

---

[64] The consensus among the officers attending the training who spoke to OIG-NYPD was that, in a real-world scenario, the "proper" arm bar was unrealistic and undependable during a physical encounter.
[65] Samuel Walker, THE COMMUNITY VOICE IN POLICING: OLD ISSUES, NEW EVIDENCE (Feb. 2015), https://nacole.org/wp-content/uploads/WalkerSeattlePaperFeb4.pdf.
[66] POLICE EXEC. RESEARCH FORUM, CRITICAL ISSUES IN POLICING SERIES: RE-ENGINEERING TRAINING ON POLICE USE OF FORCE (2015) [hereinafter "CRITICAL ISSUES 2015"], http://www.policeforum.org/assets/reengineeringtraining.pdf (last visited Aug 27, 2015).

### d. Assessment of NYPD's Training

#### i. Academy Training

NYPD's scenario and simulation trainings are thorough, valuable exercises. The scenario and simulation instructors who taught the classes that OIG-NYPD observed were engaging, knowledgeable, and eager to offer the recruits constructive criticism that could help them in real-world encounters. However, when representatives of OIG-NYPD attended the scenario and simulation trainings, those exercises filled only three out of approximately 180 days of recruits' time at the Academy. According to a 2015 nationwide survey conducted by the Police Executive Research Forum (PERF), an average of 24 hours in basic training is spent on use-of-force scenario-based training.[67] While NYPD is roughly on par with these statistics, the lack of practical training is felt among recruits and instructors. Multiple NYPD personnel who were interviewed at the Academy acknowledged the brevity of the scenario and simulation trainings, and expressed a desire for these programs to be lengthened and further developed. NYPD recruits also commented on how they were only able to run through the practical training exercises once or twice, due to time and logistical constraints, and as a result, felt they were unable to fully grasp the concepts being taught.

Recruits need to practice the application of their learned skills in scenarios prior to dealing with the public. In addition to the written final exam at the Academy, a practical assessment that presents situations in which an officer must use NYPD techniques to problem-solve should be implemented in order to fully evaluate recruits. According to a survey conducted by the Census of State and Local Law Enforcement Training Academies (CLETA), 74% of surveyed agencies evaluated recruits with scenario-based exams.[68] Practical exams should be paired with the written exams that follow each Academy trimester in order to monitor recruits' progress and reinforce the importance of their interactions with the public. Other portions of recruits' training, such as classroom work and firearms proficiency, are already evaluated with graded exams. The Academy should adopt a formal evaluation system for its scenario-based training if NYPD is to prepare recruits for the sorts of encounters they will face every day on the job.

There is also too little focus on de-escalation during NYPD's training sessions. According to the 2015 PERF survey, an average of eight hours was devoted to training officers in de-escalation nationwide, compared to an average of 58 hours of firearms training and 49 hours of defensive tactics.[69] NYPD spends only a portion of a four-and-a-half-hour course teaching de-

---

[67] U. S. DEP'T OF JUSTICE, BUREAU JUST. STAT., CENSUS OF STATE AND LOCAL LAW ENFORCEMENT TRAINING ACADEMIES 2006 ("CLETA 2006"), ICPSR 27262 (Inter-university Consortium Pol. & Soc. Res. [distributor] 2012), http://www.icpsr.umich.edu/icpsrweb/NACJD/studies/27262/version/1.
[68] Police Executive Research Forum, CRITICAL ISSUES IN POLICING SERIES RE-ENGINEERING TRAINING ON POLICE USE OF FORCE (2015), http://www.policeforum.org/assets/reengineeringtraining.pdf (last visited Aug 27, 2015).
[69] Id.

Case 1:15-cv-01989-JKB Doc Recommendations on NYPD's Policies and Practices Page 47 of 90

escalation, out of 468 classroom hours—less than one percent of the curriculum. There is currently no Academy course specifically devoted to learning and practicing de-escalation techniques. While there is value in discussing de-escalation in the context of relevant classes, such as Policing Professionally, a stand-alone course concentrating on de-escalation and tactical communication would demonstrate the importance of these skill sets to recruits, and also allow them to immerse themselves in the material.

### ii. In-Service Training

When members of OIG-NYPD's staff attended the in-service Smart Policing program, the instructors merely skimmed over the de-escalation skills and did not engage with the officers being trained during the presentation. The instructors emphasized that officers should use proper and effective communication instead of using force, but provided no concrete examples, scenarios, or anecdotes in order to teach officers <u>how</u> to de-escalate a situation and did little to reinforce the importance of de-escalation. Similar to the Academy training, in-service training should include a greater focus on de-escalation, both in the classroom and in scenario-based situations.

### VII.    Discipline

NYPD's disciplinary system is complex, with multiple offices, both within and outside the Department, working towards the goal of maintaining accountability of officers who engage in misconduct.

For this Report, OIG-NYPD reviewed 179 substantiated CCRB cases with a total of 207 allegations. For the discipline review, OIG-NYPD excluded 59 cases that are currently pending final disposition at NYPD and 12 cases in which OIG-NYPD's team of former law enforcement and police oversight professionals disagreed with CCRB's disposition. OIG-NYPD also excluded the five cases where the statute of limitations expired before discipline could be imposed and one case where the officer retired before the case was closed. Finally, OIG-NYPD excluded the three cases in which CCRB reversed its own finding or disciplinary recommendation upon a request for reconsideration by NYPD.[70] With all of these exclusions, OIG-NYPD closely analyzed the remaining 100 cases, comprising 104 allegations, for the discipline review.

### a.  OIG-NYPD's Departures from CCRB's Recommendations

After a thorough review of the investigative files for the 179 CCRB cases, OIG-NYPD investigators ultimately reached a different conclusion in 12 instances, or 6.7% of the time. In these 12 cases, OIG-NYPD determined that the excessive force in question was either:

1) proportional and objectively reasonable based on the totality of the circumstances; or
2) substantiated with insufficient evidence to determine, based on a preponderance of the evidence, that the officer's actions constituted misconduct.

For example, considering the harmful consequences that can result from the use of firearms, NYPD policy states that officers can draw their service weapon and point it toward someone as long as there is a reasonable fear for the officer's or another's personal safety. In certain cases where CCRB determined that the officer had improperly used force by drawing a service weapon, OIG-NYPD investigators instead concluded that the officers in these specific cases had articulated sufficient justifications to draw and point their service weapons. In other cases where CCRB determined that officers had improperly used excessive physical force, OIG-NYPD investigators concluded that, under the specific facts of these cases, the officer's use of force was reasonable given the need to overcome violent resistance.

In each case, OIG-NYPD's review team conducted a searching review of the investigative file and rigorously examined each case, even though they did not re-interview the involved officers. OIG-NYPD's findings are limited to the scope and purpose of this Report and the fact that OIG-NYPD has reached a different conclusion is not a statement about CCRB's own findings and processes.

---

[70] NYC CCRB, APU AND POLICE DISCIPLINE, http://www.nyc.gov/html/ccrb/html/police/police.shtml (last visited Sep 10, 2015).

### b. Disciplinary Outcomes Across 104 Substantiated Use-of-Force Allegations

| CATEGORIES OF NYPD DISCIPLINE | |
|---|---|
| Instructions | Instructions are a non-punitive measure of discipline, which requires the subject officer to receive instruction from their commanding officer on proper conduct and procedures with respect to any substantiated allegations. Sometimes the member is sent to the Police Academy for retraining.[71] |
| Command Discipline | Command Discipline is a more serious but non-judicial punishment that will be adjudicated at an informal hearing by a commanding officer.[72] The penalties range from a warning to the forfeiture of vacation days, all depending on the severity of the misconduct and the officer's past disciplinary record and performance record. It is divided into two schedules: <br><br> Schedule A: applies to less serious misconduct and carries up to forfeiture of five vacation days (*i.e., improperly kept uniform or equipment, failure to maintain neat and clean personal appearance, using any unauthorized electronic/digital device while on duty, etc.*).[73] <br><br> Schedule B: applies to more serious misconduct and carries penalties of forfeiture of up to 10 vacation days (*i.e., loss of Department property, failure to safeguard a prisoner, etc.*). |
| Charges and Specifications | Charges and Specifications are the most serious disciplinary measure, which can be filed against an officer who commits serious misconduct. Charges and Specifications may result in an Official Department Trial prosecuted by the Department Advocate's Office (DAO) or by CCRB's Administrative Prosecution Unit (APU). <br><br> If an officer is found guilty of misconduct, the penalties may range from the forfeiture of vacation days to termination. |

---

[71] NYC CCRB, APU AND POLICE DISCIPLINE, http://www.nyc.gov/html/ccrb/html/police/police.shtml (last visited Sep 10, 2015).

[72] 2014 NYPD PATROL GUIDE, COMMAND DISCIPLINE [PROC. NO.] 206-02 (Effective Aug. 1, 2013).

[73] 2014 NYPD PATROL GUIDE, VIOLATIONS SUBJECT TO COMMAND DISCIPLINE [PROC. NO.] 203-12 (Effective Aug. 1, 2013).

As noted, OIG-NYPD examined 104 substantiated allegations from the initial complaint through investigation, prosecution, and final decision. From these data, OIG-NYPD found that the trends initially observed in the January 2015 Chokehold Report are not an anomaly, but appear to be endemic of a larger dissonance between CCRB and NYPD. In a number of cases, the Department has failed to meet its fundamental obligation to police itself.

NYPD frequently failed to impose discipline even when provided with evidence of excessive force. NYPD imposed no discipline in 37 of 104, or 35.6%, of substantiated allegations in which OIG-NYPD's independent review confirmed that officers used excessive force that was not warranted under the circumstances. As noted in Figure 12 below, in the cases decided prior to January 2014, NYPD declined to impose discipline in 34 of 77 allegations, or 44.1% of the time. After January 1, 2014, NYPD declined discipline in three of 27 allegations, or 11.1% of the time. Although the rate is trending downward, given the small number of data points post-January 1, 2014, OIG-NYPD will continue to monitor the issue.

**Figure 12: Final Disciplinary Dispositions Across 104 Substantiated Use-of-Force Allegations[74]**

| Breakdown of Final Disciplinary Dispositions (2010-2015) | Total | Percentage |
|---|---|---|
| Instructions | 19 | 18.3% |
| "A" Command Discipline | 0 | 0% |
| "B" Command Discipline | 13 | 12.5% |
| Charges and Specifications | 35 | 33.6% |
| No disciplinary action | 37 | 35.6% |
| **Total** | **104** | **100%** |

| Breakdown of Final Disciplinary Dispositions (2010-2013) | Total | Percentage |
|---|---|---|
| Instructions | 18 | 23.4% |
| "A" Command Discipline | 0 | 0% |
| "B" Command Discipline | 10 | 13% |
| Charges and Specifications | 15 | 19.5% |
| No disciplinary action | 34 | 44.1% |
| **Total** | **77** | **100%** |

| Breakdown of Final Disciplinary Dispositions (2014-2015) | Total | Percentage |
|---|---|---|
| Instructions | 1 | 3.7% |
| "A" Command Discipline | 0 | 0% |
| "B" Command Discipline | 3 | 11.1% |
| Charges and Specifications | 20 | 74.1% |
| No disciplinary action | 3 | 11.1% |
| **Total** | **27** | **100%** |

[74] The 104 count excludes one allegation against a police officer who retired before the disposition of the case and six allegations (over five cases) where the statute of limitations expired before the conclusion of the respective cases.

Furthermore, in the Chokehold Report, OIG-NYPD examined the scenarios under which NYPD downgraded the discipline recommended by CCRB. In that report, OIG-NYPD found that the Police Commissioner departed from CCRB's disciplinary recommendation in six out of six chokehold cases. OIG-NYPD's latest research illustrates how this trend of downward departures is not limited to chokehold cases. As shown in the Figure 13 below, OIG-NYPD found that across 92 substantiated use-of-force allegations, NYPD departed downward from CCRB's disciplinary recommendation—or imposed no disciplinary action whatsoever—67.4% of the time.[75] The rate of disciplinary downgrading in use-of-force cases has slowed in the last 18 months. Nevertheless, the gulf between CCRB and NYPD remains and should be addressed.

**Figure 13: Dispositions in which NYPD Departed from CCRB's Recommendation**

| Departures (2010-2015) | Total | Percentage |
|---|---|---|
| Departed Downward | 62 | 67.4% |
| Departed Upward | 1 | 1.1% |
| Upheld Recommendation | 29 | 31.5% |
| **Total** | **92** | **100%** |

| Departures (2010-2013) | Total | Percentage |
|---|---|---|
| Departed Downward | 58 | 80.6% |
| Departed Upward | 1 | 1.4% |
| Upheld Recommendation | 13 | 18% |
| **Total** | **72** | **100%** |

| Departures (2014-2015) | Total | Percentage |
|---|---|---|
| Departed Downward | 4 | 20.0% |
| Departed Upward | 0 | 0% |
| Upheld Recommendation | 16 | 80.0% |
| **Total** | **20** | **100%** |

Figure 14 below illustrates the full life-cycle of the 111 allegations that had progressed to final disposition at the time of the writing of this Report.[76] Each dot in the chart represents one allegation. The "Final Disposition" section of the chart shows only the most severe penalty imposed per allegation. Many of the penalties are frequently packaged together, such as a forfeiture of vacation days and Instructions.

---

[75] This count excludes the three allegations in which the Board made no disciplinary recommendations and the nine allegations in which NYPD's prosecuting authority upheld CCRB's recommendation, i.e., Charges and Specifications were brought against the officers. However, because NYPD's administrative judge recommended a "Not Guilty" disposition in each of these cases, no discipline was ultimately imposed.

[76] The 111 allegations here include all of the 104 allegations discussed above, plus the one case where the subject officer retired and the five cases (six allegations) where the statute of limitations expired before the conclusion of the cases.

Case 1:15-cv-01989-KBF Document 75-17 Filed 05/04/16 Page 53 of 90

**Figure 14: Life-cycles of Substantiated CCRB Force Allegations**



Currently, when CCRB recommends Charges and Specifications, the case is prosecuted by CCRB's APU.[77] Prior to the creation of APU, however, DAO reviewed all disciplinary recommendations issued by CCRB and made its own recommendations to the Police Commissioner. A total of 97 out of the 111 use-of-force allegations were under DAO's jurisdiction and the remaining 14 allegations were handled by APU.

OIG-NYPD observed that over these 97 use-of-force allegations, DAO's most common disciplinary recommendation to the Police Commissioner was no disciplinary action at all, which occurred in 33 instances, or 34.0% of the time. By contrast, DAO recommended Charges and Specifications, the highest possible level of discipline, in 23, or 23.7%, of the allegations.[78]

In the 23 instances where DAO recommended Charges and Specifications, the Police Commissioner imposed discipline in 20 cases, or 87.0% of the time, with the remaining three cases, or 13.0%, being instances where the NYPD's administrative judge recommended a disposition of "not guilty." Figure 15 below shows all of the Charges and Specifications dispositions that progressed through DAO, the trial outcomes, and the ultimate penalty, if any, imposed for those allegations.

---

[77] See *infra* App. D (for a full understanding of how APU was created and how it functions).
[78] Of the remaining 41 allegations, four (4.1%) were closed administratively because the statute of limitations had expired, one (1.0%) was closed as it was against a police officer who retired before the final disposition of the case, and DAO recommended Instructions (21 allegations, 21.6%) or Schedule "B" Command Discipline (15 allegations 15.5%) in the remaining instances. DAO did not recommend Schedule "A" Command Discipline in any of the 97 allegations.

**Figure 15: Life-cycles of the Charges and Specifications Allegations Prosecuted by DAO**



As noted, APU has since taken over the prosecution of cases in instances where CCRB has recommended Charges and Specifications.[79] Figure 16 below illustrates the full life-cycles

---

[79] DAO, however, continues to review all other cases where CCRB has recommended lower penalties. Pursuant to §1-42 of the Rules of the CCRB, DAO may also review cases in "limited circumstances where the Police Commissioner determines that the Board's prosecution of Charges would be detrimental to the Police Department's disciplinary process." These include cases where "there are parallel or related criminal

of the 12 allegations that had progressed through APU to final disposition at the time of the writing of this Report.[80] Of the 12 substantiated allegations prosecuted by APU, six resulted in "not guilty" findings, five resulted in some type of guilty disposition, and the remaining allegation resulted in a "*nolo contendere*" (no contest) plea.

**Figure 16: Life-cycles of the Charges and Specifications Allegations Prosecuted by APU**



---

investigations, or when, in the instance of an officer with no disciplinary history or prior substantiated [CCRB] complaints, based on such an officer's record and disciplinary history the interests of justice would not be served."
[80] This number excludes two allegations that were closed administratively as the statute of limitations expired.

### i.   Measuring the Penalty

It is currently impossible for OIG-NYPD to determine how much an officer is punished when there are multiple allegations against the officer. In the paperwork produced by DAO, final dispositions combine all penalties into a single penalty. As a result, it cannot be determined how much of the sanction can be attributed to each distinct charge.[81]

For example, in one case OIG-NYPD reviewed for this Report, an officer faced one count for punching a complainant, four counts for unlawful stops, and one count for an unlawful arrest. The officer plead *nolo contendere* to the charges and received a penalty of 30 vacation days. In the case file produced by DAO, it is impossible to determine how many days were leveled specifically for the punch.

Determining the adequacy of punishment is always going to depend on the facts of a given case, but failing to make clear the weight of a particular instance of misconduct confounds reviewers looking to determine adequacy of punishment and actively hampers the ability of officers to understand the cost breakdown of particular instances of misconduct.

Further frustrating the process is determining the extent to which an officer's placement on force monitoring may impact the sanction. While NYPD has access to a variety of information, ranging from the subject officer's disciplinary records and CCRB history to their commanding officer's evaluation, it is not possible to determine how much weight, if any, NYPD placed on any of these sources of information in a particular case.[82]

For example, OIG-NYPD noted that five subject officers in the completed CCRB force cases had already been placed on force monitoring at the time the underlying force allegation was referred to NYPD for adjudication. While the officer's monitoring history was acknowledged by NYPD, these five officers still received no discipline for having used excessive force. Moreover, with respect to Charges and Specification cases handled by APU, NYPD voluntarily provided APU with data on the officer's productivity, but monitoring history, an important factor that might impact APU's decision on what penalty to seek, was not provided to APU.

OIG-NYPD therefore believes that, as a threshold matter, each allegation should have its specific penalty set forth in NYPD documents so that every individual instance of misconduct can be measured. Once the actual weight is measured, the adequacy of the penalty can be determined. Additionally, while NYPD notes which factors were considered in arriving at a penalty, NYPD should also explicitly indicate how much weight, if any, was given to any of these

---

[81] It is unclear from a review of the disciplinary documents whether NYPD disaggregates the penalty imposed on DAO documents and only aggregates them on final disposition documents. As it stands, OIG-NYPD is unable to measure unique penalties for each allegation, based on the documentation provided by NYPD.
[82] NYPD maintains a Central Personnel Index (CPI) for each officer, which contains information such as disciplinary history, monitoring history, and whether the officer has been a named defendant in a civil lawsuit.

factors. Lastly, the Department should study whether the discipline it imposes is actually reducing occurrences of excessive force and achieving the desired deterrent effect.

### c. Changes in How CCRB and NYPD Work Together

Because OIG-NYPD's sample was comprised of substantiated CCRB force cases from 2010 through 2014, it is important to acknowledge that there were three changes in how CCRB cases were handled by NYPD during that time period:

1) Since April 11, 2013, APU has been prosecuting CCRB cases directly in NYPD's Trial Room. Prior to that date, DAO prosecuted all substantiated CCRB cases.
2) Since April 11, 2013, the Police Commissioner is required to provide, in writing, an explanation in cases where CCRB recommended that Charges and Specifications be imposed, and NYPD departed downward from CCRB's recommendations.
3) Since December 2014, DAO may request that CCRB reopen and reconsider the disposition or penalty recommendation of a case. DAO may provide additional legal or factual information to be taken into account in the reconsideration process.

### i. Requirement to Provide Written Explanation for Downward Departures

OIG-NYPD's investigation revealed a number of cases in which the Police Commissioner did not provide any written explanation for downward departures. As noted in the Chokehold Report, the Police Commissioner was under no obligation to give any such explanation until April 11, 2013, pursuant to the Rules of the City of New York, Title 38A, Chapter 1, § 1-46(f) ("Rules of the CCRB").[83] City rules have since required the Police Commissioner to provide some measure of transparency concerning disciplinary decisions in CCRB cases. Put simply, while the Police Commissioner still has full authority and discretion to impose discipline deemed appropriate, the Commissioner must now answer for those disciplinary decisions in certain cases by providing reasons for any downward departure from a discipline determination recommended by CCRB. This requirement was adopted following the entry of a Memorandum of Understanding (MOU) between NYPD and CCRB and applies to cases in which the allegation has been substantiated against an officer and where the Board recommends that formal Charges and Specifications be brought against such officer.[84]

As seen in Figure 17, of the 104 substantiated allegations reviewed that were affected by the MOU, CCRB recommended Charges and Specifications in 28 instances. Of these 28 Charges and Specifications recommendations, eight were made in 2013. The Police Commissioner upheld Charges and Specifications in two of those eight instances, and departed downward from CCRB's disciplinary recommendations of Charges and Specifications in the

---

[83] Rules of the City of New York, Title 38A, Chapter 1, §1-46(f).
[84] *Id.* at §1-41(a).

other six. The Police Commissioner did not provide a written explanation for any of these departures. In the cases decided by the Police Commissioner since January 1, 2014, CCRB recommended Charges and Specifications in 20 instances. The Police Commissioner upheld CCRB's recommendations all of those instances.[85]

**Figure 17: Failure to Provide Written Explanation/Obligation to Provide Written Explanation Under CCRB/NYPD MOU**

| Time Period | Allegations where CCRB Recommended Charges and Specifications since CCRB MOU | | Allegations where Police Commissioner Departed Downward and was Obligated to Provide Written Explanation | | Written Explanations Provided | |
|---|---|---|---|---|---|---|
| 2013 | 8 | 28.6% | 6 | 100% | 0 | 0% |
| 2014-2015 | 20 | 71.4% | 0 | 0% | - | - |
| Total | 28 | 100% | 6 | 100% | 0 | 0% |

### ii.  Reconsideration

On December 10, 2014, pursuant to §1-55(b) of the Rules of the CCRB, that agency revised its "Reconsideration or Reopening of Cases" process and adopted a new protocol whereby NYPD, through DAO, can now request in writing that CCRB reconsider the disposition and/or penalty recommendation of a CCRB decision.[86] Upon receipt of this written request, CCRB may reconsider or reopen the case if:

1) The penalty recommended for the case by the deciding panel or Full Board against any subject officer is found by the Full Board to be inappropriate or excessive; or

2) There exist new facts or evidence that were not previously known by the deciding panel or Full Board which could reasonably lead to a different finding or recommendation in the case; or

3) There are matters of fact or law which are found to have been overlooked or misapprehended by the deciding panel or Full Board.

Rules of CCRB, §1-55(b).

---

[85] This count excludes the one case in which CCRB reversed its own determination of the allegation from substantiated to unsubstantiated upon review of NYPD's request for reconsideration. In this case, the Police Commissioner imposed no disciplinary action because CCRB ultimately unsubstantiated the allegation.
[86] Statistical information regarding use of "reconsideration" from 2013 through 2015 can be found on CCRB's website. CCRB, Reconsideration Analysis (July 8, 2015), http://www.nyc.gov/html/ccrb/downloads/pdf/report-case-reconsideration-analysis-20150708.pdf (last visited September 8, 2015).

All requests for reconsideration must be sent to CCRB within 30 days of CCRB's initial findings and recommendations. If CCRB chooses to re-review the case, the case is re-presented to the panel that initially voted to substantiate the case with the addition of DAO's factual or legal information. The CCRB panel then reviews and re-votes on the disposition of the case. If CCRB declines to re-review the case, CCRB must state its reasons.[87] This process, according to CCRB, "would allow for correcting mistaken decisions or penalties and achieving a new level of respect for CCRB decisions."

Since the new reconsideration process went into effect, rather than depart downward from CCRB's disciplinary recommendations, NYPD has sent more cases back for reconsideration.[88] This process has afforded both agencies the opportunity to increase their collaboration regarding the disciplinary process. While CCRB and NYPD are arriving at more harmonious decisions, OIG-NYPD has not yet reviewed the full effects of the new reconsideration process. As recently noted by CCRB in its semi-annual report, "DAO has increased its rate of agreement with the Board's recommendations both for substantiations and for discipline."[89] Also, according to CCRB, DAO has given more deference to the CCRB process, resulting in "record-high implementation of [CCRB's] recommendations."[90]

[87] CCRB has noted that it is assigning lawyers to the Board's reconsideration panels to draft memos to be sent back to DAO explaining the panel's decision on reconsideration.
[88] NYPD requested reconsideration in seven of the 179 substantiated force cases reviewed by OIG-NYPD for this Report. Two cases involved reconsideration of non-force allegations. Of the remaining five, the panel reversed its disposition on the force allegations in two cases and refused to alter its disposition on the third. APU agreed to settle to a lesser penalty on the fourth case and DAO declined prosecution on the fifth case while it was pending reconsideration. Excluded from OIG-NYPD's review of the 179 substantiated force cases involved a case whereby the panel initially unsubstantiated the force allegation but then reversed its decision after NYPD's request for reconsideration on non-force allegations.
[89] NEW YORK CITY CIVILIAN COMPLAINT REVIEW BD., SEMI-ANNUAL REPORT JANUARY-JUNE 2015 (2015), http://www.nyc.gov/html/ccrb/downloads/pdf/2015-Semi-Annual-Report-Web.pdf.
[90] Id. at 24.

### VIII.  Recommendations

OIG-NYPD's recommendations are designed to improve NYPD's tracking of force data and to curb excessive force through better training and enhanced accountability of the disciplinary system.  The recommendations below are organized with respect to four major areas involving NYPD's policies and practices governing officers' use of force.  These areas relate to NYPD's: (1) use-of-force policy; (2) reporting and documentation mechanisms for use of force; (3) training on force and de-escalation; and (4) disciplinary system.[91]

### A. <u>USE-OF-FORCE POLICY</u>

Tracking the use of force by police officers first requires defining what is meant by "force," "excessive force," and "deadly force."  The current NYPD Patrol Guide contains no definition of "force."  While Patrol Guide §203-11 provides broad principles declaring that force must be limited to what is necessary under the circumstances, the guide does not clarify what actions constitute "force."  Likewise, Patrol Guide §203-11 states in highlighted language that "<u>EXCESSIVE FORCE WILL NOT BE TOLERATED</u>," but the Patrol Guide does not define or clarify what is meant by "excessive force."  While the Patrol Guide contains a separate section on "Deadly Physical Force" with clear, delineated instructions on when deadly force is permitted and when firearms use is prohibited, Patrol Guide §203-12 does not define what constitutes "deadly physical force."

The NYPD Patrol Guide is relatively silent on de-escalation, a tactic which has seen greater adoption nationwide and which OIG-NYPD believes should be required in all encounters where appropriate.

1. **The NYPD Patrol Guide should include definitional language that provides officers and the public with greater clarity regarding what is meant by "force," "excessive force," and "deadly physical force."**

2. **NYPD should update Patrol Guide §203-11 governing use of force and require officers to de-escalate all encounters where appropriate.**

---

[91] As previously mentioned, NYPD is currently contemplating revisions to the Patrol Guide which are expected to include changes to the Department's use-of-force policies and procedures, including the tracking and reporting of force incidents.

## B. REPORTING AND DOCUMENTATION

NYPD currently does not have a separate, centralized, and mandatory use-of-force form for documenting when physical force has been used. Instead, the Department has a variety of forms and documents that officers are required to complete depending on the incident. This patchwork set of forms, designed to track other data, does not capture the entire universe of force cases. OIG-NYPD's review of 179 CCRB force cases further revealed that officers did not always document when force was used and, when force was documented, the paperwork was often either inadequate or inaccurate. Because of the lack of adequate reporting, there is likely to be current underreporting of force encounters by officers.

To help ensure better accountability, NYPD must develop clear policies that require the documentation of use of force by all officers involved in an incident. Such a policy must provide sufficient guidance to officers on how to report force and what information the report must contain, including a requirement that officers specify with particularity the kind of force used and the resistance they may have encountered. A separate use-of-force form would capture the salient and relevant details in a comprehensive and thorough manner.

Finally, because of the importance of use-of-force issues, NYPD should collect, analyze, and publish comprehensive data on the issue in order to improve its policies and procedures and educate the public about how and when officers deploy force.

3. **NYPD should create a separate, uniform use-of-force reporting form.**

4. **With respect to the newly created form, NYPD should require all officers—whether the subject of a force investigation or a witness to a use of force—to document and report all force incidents. When completing this document, officers should use descriptive language to articulate the events leading up to the use of force in encounters with the public, the reason why the force was used, and the level and type of force used.**

5. **NYPD should create a database to track comprehensive Department-wide information on use of force, including data compiled from the use-of-force forms.**

6. **NYPD should compile data and publish, on an annual basis, a report addressing Department-wide metrics on use of force, including but not limited to information from the new use-of-force reporting form. This report would track and collect various components related to the issue of use of force, including those addressed in this Report, such as officer tenure, assignments, age, type of force used, pertinent information regarding members of the public subjected to force, as well as officer injuries, disciplinary trends and outcomes, and other data deemed necessary for a comprehensive understanding of the issue.**

Case 1:15-cv-01989-KBF   Document 75-17   Filed 05/04/16   Page 63 of 90

## C. TRAINING

De-escalation policies and tactics have the potential to greatly mitigate the use of excessive force by police officers.  De-escalation tactics have a proven track record of not only limiting force, but ensuring officer safety.  OIG-NYPD's review, however, revealed there is too little focus on de-escalation during NYPD's training sessions.  The Department spends only a portion of a four-and-a-half-hour course teaching de-escalation—less than one percent of the 468 hours of classroom instruction.  There is currently no Academy course specifically devoted to learning and practicing de-escalation techniques.  There is also a clear need to train officers to intervene in situations where they witness fellow officers engaging in misconduct.

Furthermore, improvements can be made with respect to how students are evaluated. Written exams—which constitute the bulk of Academy testing—should be paired with practical, scenario-based exams which allow students to demonstrate the skills they have learned.  Such scenario-based exams should be incorporated into the Academy's overall evaluation of the student if NYPD is to prepare recruits for the types of encounters they will face every day on the job.

7. NYPD training should place a stronger and more thorough emphasis on de-escalation tactics and philosophy, by adding specific Police Academy and in-service courses on de-escalation that incorporate both classroom and scenario-based training.

8. NYPD should incorporate a formal evaluation system for all scenario-based trainings concerning the use of force.

9. NYPD should increase funding and personnel at the Police Academy with respect to training for both recruits and in-service officers.

10. NYPD should implement training to instruct officers to intervene in situations where other officers escalate encounters, use excessive force, and/or commit other misconduct.

11. NYPD should review use-of-force trends to identify which categories of officers (e.g., by years of service and/or duty assignments) are most in need of de-escalation and use-of-force in-service training, and then implement such instruction.

## D. **DISCIPLINE**

Monitoring NYPD's disciplinary system is complicated by an inability to precisely measure the adequacy of sanctions. Because disciplinary recommendations and final dispositions combine all disciplinary dispositions into a single penalty in the paperwork produced by DAO, it is impossible to determine how much of the sanction can be attributed to each distinct charge.

Further confounding the process is determining the extent to which an officer's placement on force monitoring may impact the sanction. While NYPD has access to a variety of information ranging from subject officers' disciplinary records and CCRB histories to their commanding officer's evaluation, it is not possible to determine how much weight, if any, NYPD places on any of these sources of information in a particular case.

OIG-NYPD therefore believes that, as a threshold matter, each allegation should have its specific penalty set forth in NYPD documents so that each individual instance of misconduct can be measured. Once the actual weight of the infraction is measured, the adequacy of a penalty can be determined. Additionally, while NYPD notes which factors were considered in arriving at a penalty, NYPD should also explicitly indicate how much weight, if any, was given to any of these factors. Lastly, NYPD should study whether the discipline it imposes is actually reducing occurrences of excessive force and achieving the desired deterrent effect.

12. **In disciplinary cases where there are multiple disciplinary counts, each count should have an accompanying, distinct penalty, as opposed to an aggregated penalty for all counts.**

13. **NYPD should collect, review, and compare data regarding disciplinary penalties imposed in use-of-force cases and report on the effects of disciplinary penalties on the frequency of incidents of excessive force. NYPD should publish data in the previously mentioned annual report (*Recommendation #6*) on the number and percentage of cases in which the Police Commissioner reduces or declines discipline.**

14. **NYPD should set forth, in writing, in its disciplinary paperwork the extent to which an officer's placement on force monitoring has or has not impacted the penalty imposed.**

15. **NYPD should share a subject officer's force monitoring history with CCRB's Administrative Prosecution Unit (APU) since this information is a critical element that must be taken into consideration when CCRB recommends penalties.**

POLICE USE OF FORCE IN NEW YORK CITY: FINDINGS AND RECOMMENDATIONS ON NYPD'S POLICIES AND PRACTICES
OCTOBER 2015

*Please contact us at:*

**Office of the Inspector General for the New York City Police Department**
New York City Department of Investigation
80 Maiden Lane
New York, NY 10038
Telephone: (212) 806-5200
www.nyc.gov/oignypd

For general inquiries, please email inquiry@oignypd.nyc.gov

For OIG-NYPD's Press Office, please call (212) 806-5225 or email press@oignypd.nyc.gov

For OIG-NYPD's Community Outreach Unit, please call (212) 806-5234 or email
communityoutreach@oignypd.nyc.gov

# APPENDIX A

# NYPD Patrol Guide Procedures

# PATROL GUIDE



| Section:  General Regulations | Procedure No:   203-11 |
|---|---|
| **USE OF FORCE** | |

| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 2 |
|---|---|---|---|

**USE OF FORCE**   All uniformed members of the service are responsible and accountable for the proper use of force under appropriate circumstances. Members of the service are reminded that the application of force <u>must</u> be consistent with existing law and with New York City Police Department Values, by which we pledge to value human life and respect the dignity of each individual.  Depending upon the circumstances, both federal and state laws provide for criminal sanctions and civil liability against uniformed members of the service, when force is deemed excessive, wrongful or improperly applied.

The primary duty of <u>all</u> members of the service is to preserve human life.  Only that amount of force necessary to overcome resistance will be used to effect an arrest or take a mentally ill or emotionally disturbed person into custody.  Deadly physical force will be used <u>ONLY</u> as a last resort and consistent with Department policy and the law.

At the scene of a police incident, many members of the service may be present and some members may not be directly involved in taking police actions. However, this does <u>not</u> relieve any member present of the obligation to ensure that the requirements of the law and Department regulations are complied with. Members of the service are required to maintain control or intervene if the use of force against a subject clearly becomes excessive.  Failure to do so may result in both criminal and civil liability.   <u>EXCESSIVE FORCE WILL NOT BE TOLERATED.</u>

All members of the service at the scene of a police incident <u>must</u>:
a.    Immediately establish firearms control
b.    Use minimum necessary force
c.    Employ non-lethal alternatives, as appropriate.

Members of the New York City Police Department will <u>NOT</u> use chokeholds.  A chokehold shall include, but is not limited to, any pressure to the throat or windpipe, which may prevent or hinder breathing or reduce intake of air.

Whenever it becomes necessary to take a violent or resisting subject into custody, responding officers should utilize appropriate tactics in a coordinated effort to overcome resistance (for example see *P.G. 216-05, "Mentally Ill or Emotionally Disturbed Persons"*).  The patrol supervisor, if present, should direct and control all activity. Whenever possible, members should make every effort to avoid tactics, such as sitting or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 203-11 | 08/01/13 | | 2 of 2 |

**USE OF FORCE (continued)**

Persons taken into custody (i.e., arrest, mentally ill, emotionally disturbed, etc.) shall be rear cuffed at the earliest opportunity to reduce the potential for resistance, which may cause injuries. In addition, alternate restraining devices (Velcro straps, mesh restraining blankets, etc.) shall be used, at the earliest opportunity, to restrain or further restrain a subject whose actions or behavior may cause injury to himself/herself or others.

After an individual has been controlled and placed under custodial restraint using handcuffs and other authorized methods, the person should be positioned so as to promote free breathing. The subject should not be maintained or transported in a face down position.

The member assuming custody of the subject should closely observe him or her for any apparent injuries. If the area is dark, a flashlight or other source of illumination should be used to maintain a clear view of the subject at all times.

If a person appears to be having difficulty breathing or is otherwise demonstrating life-threatening symptoms, medical assistance will be requested immediately. The patrol supervisor will direct that alternate means to maintain custody be utilized, if appropriate.

The use of restraints to "hog-tie" (restraining person by connecting or tying rear cuffed hands to cuffed or shackled ankles or legs) subjects and the transportation of subjects in a face down position within any vehicle are prohibited.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| Section:   General Regulations | | Procedure No:   203-12 | |
|---|---|---|---|
| **DEADLY PHYSICAL FORCE** | | | |
| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 1 |

**DEADLY PHYSICAL FORCE**

The New York City Police Department recognizes the value of all human life and is committed to respecting the dignity of every individual.  The primary duty of all members of the service is to preserve human life.

The most serious act in which a police officer can engage is the use of deadly force. The power to carry and use firearms in the course of public service is an awesome responsibility.  Respect for human life requires that, in all cases, firearms be used as a last resort, and then only to protect life.  Uniformed members of the service should use only the minimal amount of force necessary to protect human life.  Where feasible, and consistent with personal safety, some warning, such as "POLICE - DON'T MOVE," should be given.  Deadly force is never justified in the defense of property.  Above all, the safety of the public and uniformed members of the service must be the overriding concern whenever the use of firearms is considered.

**DEFINITION**

PROFESSIONAL JUDGMENT – judgment based not only upon experience as an individual but taking into account the knowledge, experience, and training gained through employment as a police officer.

## GUIDELINES FOR THE USE OF FIREARMS

**UNIFORMED MEMBER OF THE SERVICE**

a.  Police officers shall not use deadly physical force against another person unless they have probable cause to believe they must protect themselves or another person present from imminent death or serious physical injury.

b.  Police officers shall not discharge their weapons when, in their professional judgment, doing so will unnecessarily endanger innocent persons.

c.  Police officers shall not discharge their firearms in defense of property.

d.  Police officers shall not discharge their firearms to subdue a fleeing felon who presents no threat of imminent death or serious physical injury to themselves or another person present.

e.  Police officers shall not fire warning shots.

f.  Police officers shall not discharge their firearms to summon assistance except in emergency situations when someone's personal safety is endangered and unless no other reasonable means is available.

g.  Police officers shall not discharge their firearms at or from a moving vehicle unless deadly physical force is being used against the police officer or another person present, by means other than a moving vehicle.

h.  Police officers shall not discharge their firearms at a dog or other animal except to protect themselves or another person from physical injury and there is no other reasonable means to eliminate the threat.

i.  Police officers shall not, under any circumstances, cock a firearm. Firearms must be fired double action at all times.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| Section:  Command Operations | Procedure No:  212-95 |
|---|---|

### USE OF PEPPER SPRAY DEVICES

| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 4 |
|---|---|---|---|

**PURPOSE**     To inform uniformed members of the service of circumstances under which pepper spray may be intentionally discharged and to record instances where pepper spray has been discharged, intentionally or accidentally.

**SCOPE**      Use of Oleoresin Capsicum (O.C.) pepper spray constitutes physical force under the New York State Penal Law.  Use of pepper spray is proper when used in accordance with Article 35 of the Penal Law and Department procedures. O.C. pepper spray may be used when a member reasonably believes it is necessary to effect an arrest of a resisting suspect, for self-defense or defense of another from unlawful force, or to take a resisting emotionally disturbed person into custody. In many cases, pepper spray will reduce or eliminate the need for substantial physical force to effect an arrest or gain custody.  It will often reduce the potential for injuries to members and suspects that may result from physical restraint <u>and it should be regarded as a possible alternative to such force and restraint, where practical</u>.  Pepper spray shall not be used in situations that do not require the use of physical force.  O.C. pepper spray may be used in arrest or custodial restraint situations where physical presence and/or verbal commands have not been, or would not be, effective in overcoming physical resistance.

**PROCEDURE**     When necessary to use pepper spray device:

**UNIFORMED MEMBER OF THE SERVICE**

1. Hold pepper spray in an upright position, aim and discharge pepper spray into a subject's eyes for maximum effectiveness, using two one second bursts, at a minimum distance of three feet, and only in situations when the uniformed member of the service reasonably believes that it is necessary to:
   a. Protect self, or another from unlawful use of force (e.g., assault)
   b. Effect an arrest, or establish physical control of a subject resisting arrest
   c. Establish physical control of a subject attempting to flee from arrest or custody
   d. Establish physical control of an emotionally disturbed person (EDP)
   e. Control a dangerous animal, by deterring an attack, to prevent injury to persons or animals present.
2. Effect arrest of criminal suspect against who pepper spray was used and charge with crime which initiated use of the pepper spray.
   a. Add resisting arrest charge, when appropriate
   b. *P.G. 210-13, "Release Of Prisoners - General Procedure"* will be complied with if it is determined that arrested person did not commit the crime or that no crime was committed.
   c. *P.G. 216-05, "Mentally Ill Or Emotionally Disturbed Persons,"* will be complied with, when appropriate.

### NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-95 | 08/01/13 | | 2 of 4 |

**NOTE**

*Do not use pepper spray on subjects who passively resist (e.g., going limp, offering no active physical resistance). If possible, avoid using pepper spray on persons who appear to be in frail health, young children, women believed to be pregnant, or persons with known respiratory conditions. Avoid discharging pepper spray indiscriminately over a large area for disorder control. (Members who are specifically trained in the use of pepper spray for disorder control may use pepper spray in accordance with their training, and within Department guidelines, and as authorized by supervisors.). In addition, avoid using O.C. spray in small contained areas such as automobiles and closets.*

**UNIFORMED MEMBER OF THE SERVICE (continued)**

3. Request response of Emergency Medical Service (EMS) once the situation is under control.
   a. Advise person sprayed that EMS is responding.
4. Remove the subject from the contaminated area and expose to fresh air while awaiting the arrival of EMS, or transportation to hospital/ stationhouse *if tactically feasible.*
   a. Determine whether the person sprayed is wearing contact lenses. (It is strongly recommended that contact lenses be removed as soon as possible after exposure to O.C. spray.)
5. Position subject on his/her side or in a sitting position to promote free breathing.
   a. The subject should *never* be maintained or transported in a face down position.
   b. Do not sit, stand, or kneel on subject's chest or back.
6. Provide assistance to subject as follows:
   a. When consistent with member's safety, and provided a source of water is readily available, the uniformed member should flush the contaminated skin area of a subject with profuse amounts of water.
   b. Repeat flushing at short intervals, if necessary, until symptoms of distress subside.
   c. Continue flushing the contaminated skin of the subject in custody, at the stationhouse as needed.
   d. Commence the flushing of a subject's contaminated skin upon arrival at the stationhouse, if this has not already been done.

**NOTE**

*Do not rub or touch skin of contaminated person, as the initial effect of pepper spray does not dissipate for 15 - 20 minutes. Also, do not use salves, creams, ointments, commercial eye washes or bandages. The desk officer will ensure that all prisoners who have been sprayed with pepper spray receive appropriate first aid, if needed, upon arrival at the stationhouse. Desk officers are also responsible for ensuring that prisoners who have been sprayed with pepper spray are properly observed throughout the arrest process, and that they receive prompt medical attention if they need or request it. A Command Log entry will be made stating whether the prisoner has had his/her skin flushed with water, been examined by EMS, or been transported to the hospital.*

# NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-95 | 08/01/13 | | 3 of 4 |

| | | |
|---|---|---|
| **UNIFORMED MEMBER OF THE SERVICE (continued)** | 7. | Transport prisoner immediately to the emergency room of the nearest hospital if he/she is demonstrating difficulty breathing, or exhibiting signs of severe stress, hyperventilation etc. |
| | a. | Windows of transport vehicle should be kept open |
| | b. | Members who come in contact with persons who have been exposed to pepper spray must thoroughly wash their hands afterward and avoid having any contaminated clothing make contact with their face |
| | c. | Advise hospital staff that pepper spray has been used on prisoner. |
| | 8. | Prepare **ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD 244-159) and MEDICAL TREATMENT OF PRISONER (PD 244-150)** in <u>arrest</u> situations. |
| | 9. | Complete the **AIDED REPORT WORKSHEET (PD 304-152b)** in <u>non</u>-arrest situations, e.g. EDP, and: |
| | a. | Check box "O.C. Spray Used" |
| | b. | Enter rank, name, and tax registry number, of each MOS who discharged spray in the "Details" caption |
| | c. | List the time, doctor's name, and diagnosis under "Details" caption, when applicable. |
| **COMMANDING OFFICER, M.I.S.D.** | 10. | Provide a quarterly printout of all arrest and aided incidents where pepper spray was discharged to the commanding officer, Firearms and Tactics Section. |
| **COMMANDING OFFICER, FIREARMS AND TACTICS SECTION** | 11. | Analyze situations where O.C. spray was employed to evaluate its effectiveness. |
| | a. | As appropriate, modify existing training/tactics relative to the use of pepper spray. |

| | |
|---|---|
| ***ADDITIONAL DATA*** | *The only pepper spray authorized for use is the type issued to all uniformed members through the Firearms and Tactics Section.* |
| | *In order to maintain the effectiveness of the spray, it is recommended that the device be shaken at the start of each tour. Carrying the pepper spray device during normal patrol duty should be sufficient to keep the solution thoroughly mixed.* |
| | *Pepper spray will not automatically stop all subjects, and even when it does incapacitate, the effects are temporary. Members should therefore be ready to use other appropriate force options and tactics.* |
| | *When performing duty in uniform, the pepper spray shall be carried in its holster attached to the non-shooting side of the gun belt. When performing enforcement duty in civilian clothes the pepper spray <u>must</u> be carried, in the holster attached either to a belt or in another appropriate manner. Undercover members may opt <u>not</u> to carry the pepper spray. Members of the service may carry the pepper spray device during off duty hours.* |

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-95 | 08/01/13 | | 4 of 4 |

| | |
|---|---|
| **RELATED**<br>**PROCEDURES** | *Lost or Damaged Uniform (P.G. 204-07)*<br>*Prisoner Requiring Medical/Psychiatric Treatment (P.G. 210-04)*<br>*Release of Prisoners - General Procedure (P.G. 210-13)*<br>*Hazardous Material (P.G. 212-37)*<br>*Hostage/Barricaded Persons (P.G. 212-38)*<br>*Aided Cases - General Procedure (P.G. 216-01)*<br>*Preparation of Aided Report Worksheet (P.G. 216-02)*<br>*Mentally Ill or Emotionally Disturbed Persons (P.G. 216-05)*<br>*Loss or Theft of Department Property (P.G. 219-20)* |
| **FORMS AND**<br>**REPORTS** | ***AIDED REPORT WORKSHEET (PD304-152b)***<br>***ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-159)*** |

**NEW • YORK • CITY • POLICE • DEPARTMENT**



**PATROL GUIDE**

| Section: Command Operations | Procedure No: 212-117 |
|---|---|

### USE OF CONDUCTED ENERGY DEVICES (CED)

| DATE ISSUED:<br>08/01/13 | DATE EFFECTIVE:<br>08/01/13 | REVISION NUMBER: | PAGE:<br>1 of 8 |
|---|---|---|---|

**PURPOSE**

To inform members of the service of circumstances under which a Conducted Energy Device (CED) may be intentionally used and to record instances when a Conducted Energy Device has been used. CEDs will only be used by authorized uniformed members of the service. Additionally, all patrol supervisors and platoon commanders performing patrol duty assigned to the Patrol Services, Housing and Transit Bureaus will be <u>required</u> to carry a CED in a Department issued holster as authorized.

**SCOPE**

A Conducted Energy Device (CED) can be an effective means of subduing suspects and emotionally disturbed persons (EDP's) in a safe manner. A CED is classified as a less lethal device and is intended to augment and provide a greater margin of safety for officers who might otherwise be forced to physically subdue a dangerous subject. The use of a CED is within the range of use of less lethal devices such as pepper spray or a baton on the force continuum due to its effectiveness at a distance and at close range.

A CED should only be used against persons who are actively physically resisting, exhibiting active physical aggression, or to prevent individuals from physically injuring themselves or other person(s) actually present. In many cases, a CED will reduce or eliminate the need for deadly physical force. It will often reduce the potential for injuries to members and suspects that may result from physical restraint and should be regarded as a possible alternative to such force and restraint, where practical. It is prohibited to use a CED in situations that do not require the use of physical force.

**DEFINITIONS**

<u>CONDUCTED ENERGY DEVICE (CED)</u> - a device primarily designed to disrupt a subject's central nervous system by means of using electrical energy sufficient to cause uncontrolled muscle contractions and override an individual's motor responses.

<u>ACTIVATE (ACTIVATION)</u> – To cause the CED to arm by releasing the safety, thereby causing the CED laser sight to operate.

<u>CARTRIDGE</u> – a replaceable cartridge which discharges two darts on connecting wires sending a high voltage/low current signal into a subject.

<u>DARTS</u> – probes that are discharged from a CED and are designed to penetrate the skin; wires are attached to the probes leading back to the CED.

<u>DISCHARGE</u> – To activate a CED, depress the trigger and cause an electric current to flow. Discharge will result in arcing (no cartridge is present) or darts being fired (cartridge is present).

<u>TOUCH STUN</u> – To use the CED and discharge the device in a manner such that the hand-held unit makes direct contact with an intended subject's body. Touch stun mode should only be used in exceptional circumstances and <u>not as a primary method</u> of use. Therefore, when touch stun mode is used, an investigation will be conducted by the commanding officer/duty captain to determine if the CED was properly used.

### NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 2 of 8 |

**DEFINITIONS (continued)**

<u>AUTHORIZED UNIFORMED MEMBER OF THE SERVICE</u> – A uniformed member of the service who has received authorized Department training in the use of the CED.

<u>INVESTIGATING SUPERVISOR</u> - As used in this procedure will be as follows:

a.   The next highest ranking supervisor in the chain of command of the member who discharged the CED,

b.   The commanding officer/duty captain for instances of touch stun incidents, when CED is used on a person in police custody or an accidental discharge of a CED has occurred resulting in an injury to any person.

*NOTE*

*If the investigating supervisor is from a command other than Patrol Services Bureau, Housing Bureau or Transit Bureau and is not available, the investigating supervisor will be the next higher ranking supervisor from the Patrol Services Bureau. (e.g., If a sergeant assigned to a Highway Unit discharges a CED and a lieutenant is unavailable from that Unit to investigate the discharge, a PSB lieutenant or duty captain will conduct the investigation.)*

**PROCEDURE**

To provide for control, accountability, issuance, use and investigation of the use of Conducted Energy Devices (CEDs):

**COMMANDING OFFICER**

1.   Designate a secure area under the control of the desk officer or appropriate supervisor for the storage of CEDs and cartridges.

2.   Ensure availability, operability, and distribution of CEDs assigned to the command on all tours.

3.   Ensure that all supervisors performing patrol duties in the command are trained in the use of CEDs.

a.   ONLY authorized uniformed members of the service will be assigned to carry CEDs.

*NOTE*

*When requesting a replacement or loaner of a CED, replacement of batteries, chargers, or holsters, commanding officers are required to prepare and deliver a **Typed Letterhead** with item(s) needing replacement, to the Commanding Officer, Firearms and Tactics Section.*

*When requesting replacement cartridges, commanding officers shall prepare and deliver a **Typed Letterhead** to the Commanding Officer, Firearms and Tactics Section and shall attach a copy of the related **LESS  LETHAL/RESCUE EQUIPMENT USE REPORT (PD 320-151).***

**DESK OFFICER/ UNIT SUPERVISOR**

4.   Account for all CEDs and cartridges assigned to the command at the commencement of <u>each</u> tour.

a.   Make a Command Log entry, include serial numbers.

b.   Commands that do not maintain a Command Log will account for CEDs and cartridges in an appropriate Department log.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 3 of 8 |

**DESK OFFICER/ UNIT SUPERVISOR (continued)**

5.  Assign CEDs to authorized uniformed members of the service on each tour taking into account the following:
    a.  At least one operable CED must be assigned to a patrol supervisor and/or platoon commander performing patrol duty at all times.
    b.  One operable CED must be maintained at the desk.

*NOTE*   *If available, additional CEDs may be assigned to other authorized uniformed members of the service throughout the tour as determined by the commanding officer.*

6.  Indicate rank, name, shield number/tax number, as applicable, of assigned member(s) in the Command Log.
    a.  Make entry on roll call, identifying member(s) assigned a CED for tour.
    b.  Place notation "CED" next to the name of member(s) assigned a CED.
7.  Ensure CEDs, without cartridge attached, are connected to charger, if appropriate, while unassigned.
8.  Notify commanding officer when CED is inoperable.

**AUTHORIZED UNIFORMED MEMBER OF THE SERVICE/ PATROL SUPERVISOR/ PLATOON COMMANDER**

9.  Carry CED only when trained by the Firearms and Tactics Section.
    a.  CED must be carried on the non-shooting side, in a Department approved holster, attached to gunbelt, and secured to person.
    b.  Emergency Services Unit and uniformed personnel, performing duty in civilian attire, will carry CED in a holster approved by Commanding Officer, Firearms and Tactics Section and Commanding Officer, Special Operations Division, as appropriate.

*NOTE*   *Only conducted energy devices authorized by the Commanding Officer, Firearms and Tactics Section will be carried by members of the service. Carrying or use of any other unauthorized conducted energy device may result in disciplinary action.*

10.  Inspect CED to ensure operability.
    a.  Point CED in safe direction
    b.  Remove cartridge from CED
    c.  Release the safety (place safety in "off" position)
    d.  Ensure the laser is visible *and* that the battery status light indicates device is energized
    e.  Conduct spark test
    f.  Replace battery if either laser is not visible, battery status light does not operate or if spark test results confirm a weak battery
    g.  Re-inspect CED unit after battery pack is replaced
    h.  Engage safety
    i.  Attach cartridge to CED.

*NOTE*   *Cartridges must be removed and secured away from the CED prior to conducting an inspection. Accidental discharges resulting in injuries may occur if a cartridge is left attached to the CED while conducting an inspection.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 4 of 8 |

**NOTE**
**(continued)**

*Members are reminded that each discharge is registered on the CED's internal memory that records the date and time of each discharge. Therefore, whenever a CED is discharged (including a spark test to ensure operability or an accidental discharge), such discharge must be recorded in the member's ACTIVITY LOG (PD112-145), INVESTIGATOR'S DAILY ACTIVITY REPORT (PD439-156), Command Log or other appropriate Department record.*

**AUTHORIZED UNIFORMED MEMBER OF THE SERVICE/ PATROL SUPERVISOR/ PLATOON COMMANDER**

11. Inform desk officer/supervisor if the CED does not operate subsequent to battery replacement, is inoperable, or requires repair/replacement.
12. Make **ACTIVITY LOG** entry and include:
    a. Results of inspection
    b. Serial number of CED
    c. Name of desk officer/supervisor notified if CED is inoperable.
13. Return CED to desk officer upon completion of tour.

## USE OF CONDUCTED ENERGY DEVICE (CED)

**AUTHORIZED UNIFORMED MEMBER OF THE SERVICE/ PATROL SUPERVISOR/ PLATOON COMMANDER**

14. Assess situation and determine if the use of a CED would be appropriate.
15. Consider the totality of the circumstances when deciding the minimum amount of force necessary to overcome resistance when effecting an arrest or when taking mentally ill or an emotionally disturbed person into custody. Some factors to consider when determining the appropriate use of force include but are not limited to:
    a. officer/subject size disparity
    b. officer/subject strength disparity
    c. officer/subject age disparity
    d. officer's perception of the subject's willingness to resist
    e. officer's perception of the immediate threat to the subject, members of the service and bystanders
    f. suspect's violent history, if known
    g. officer's location is a hostile environment
    h. officer's perception of the subject being under the influence of a stimulant/narcotic which would effect pain tolerance and violence.

**NOTE**

*CEDs should only be used against persons who are actively physically resisting, exhibiting active physical aggression or to prevent individuals from physically injuring themselves or other person(s) actually present. Members of the service are reminded of the availability of Emergency Service Unit.*

16. Issue an appropriate warning, consistent with personal safety, to the intended subject and other members of the service present prior to discharging the CED.

**NOTE**

*The recommended point of aim is lower center mass for frontal discharges (below the chest) and below the neck area for discharges at a suspect's back. Avoid discharging at an individual's head, neck and chest, if possible. When practical, discharge the CED at the subject's back. The CED should not be intentionally aimed at an individual's groin.*

*Members will not discharge two CED's simultaneously on a subject.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 5 of 8 |

**NOTE**
**(continued)**

*When a CED is used against a subject it shall be for one standard discharge cycle and the member using the CED must then reassess the situation. Only the minimum number of cycles necessary to place the subject in custody shall be used. In no situation will more than three standard discharge cycles be used against any subject. Members are reminded of other appropriate force options should the CED fail.*

*It is strictly prohibited to use the CED on persons as a form of coercion or punishment and on persons who passively resist (e.g., going limp, offering no active physical resistance).*

*When possible, the CED should not be used on children, the elderly, obviously pregnant females, the frail, against subjects operating or riding on any moving device or vehicle (e.g., motorists, bicyclists, skateboarders) where the subject may fall while it is in motion or in situations where the subject may fall from an elevated surface.*

*The CED should not be used when combustible gases or flammable liquids are present.*

**AUTHORIZED**
**UNIFORMED**
**MEMBER OF THE**
**SERVICE/**
**PATROL**
**SUPERVISOR/**
**PLATOON**
**COMMANDER**
**(continued)**

17. Restrain individual, and secure CED.
    a. Effect arrest of criminal suspect against whom CED was used.
    b. Comply with *P.G. 210-13, "Release of Prisoner – General Procedure"* if arrested person did not commit the crime or no crime was committed.
    c. Comply with *P.G. 216-05, "Mentally Ill or Emotionally Disturbed Persons,"* when appropriate.
18. Request response of FDNY Emergency Medical Service (EMS), if person received a CED discharge.
    a. Any person who has been struck by a CED dart or who has had a CED used on him or her in touch stun mode must be examined at a medical facility.
19. Render reasonable aid as necessary.
20. Break the CED wire by hand approximately four to six inches from the dart, taking into account the circumstances including the status of the subject.
    a. Any dart that has penetrated the skin of any person will <u>only</u> be removed by medical personnel.
21. Safeguard CED cartridge.

**NOTE**

*If a CED was discharged and the darts did not make any contact with the subject (e.g., skin, clothing, etc.), the wire connecting the dart to the cartridge may be broken by hand. The dart portion shall be disposed of in a "sharps" container and the spent cartridge may be disposed of in the trash and not vouchered. An investigation will still be conducted by the investigating supervisor regarding the use of the CED.*

*Spent CED cartridges used by Emergency Service Unit personnel will be safeguarded and vouchered, when appropriate, by the command of record for the subject on whom the CED was used.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 6 of 8 |

| | | |
|---|---|---|
| **DESK OFFICER/ PATROL SUPERVISOR/ PLATOON COMMANDER/ UNIT SUPERVISOR** | 22. | Request response of investigating supervisor. |
| | 23. | Identify witnesses and record names in **ACTIVITY LOG, INVESTIGATOR'S DAILY ACTIVITY REPORT** or Command Log as appropriate. |
| | 24. | Assign member of the service to ride in body of ambulance with prisoner or aided. |
| | 25. | Direct member of the service to take photographs of points of contact on subject's body resulting from CED darts or touch stun. |
| **ASSIGNED UNIFORMED MEMBER OF THE SERVICE** | 26. | Inform hospital staff that a CED has been used on the individual. |
| | | a. Record name of person notified in **ACTIVITY LOG.** |
| | 27. | Photograph points of contact on subject's body resulting from CED darts or touch stun. |
| | | a. Photos should be taken in a manner to maintain the subject's privacy, when appropriate (e.g., behind curtain, private room, etc.). |
| | 28. | Prepare **ON LINE BOOKING SYSTEM ARREST WORKSHEET (PD244-150)** and **MEDICAL TREATMENT OF PRISONER (PD 244-150)** in <u>arrest</u> situations. |
| | 29. | Complete **AIDED REPORT WORKSHEET (PD304-152b)** in <u>non-arrest</u> situations. |
| | 30. | Prepare **PROPERTY CLERK INVOICE WORKSHEET (PD521-141a).** |
| | | a. Cartridge used will be placed in a Plastic Security Envelope and delivered to desk officer, include photographs, when applicable. |
| | | b. Ensure **PROPERTY CLERK INVOICE** number is documented in appropriate Department forms prepared. |
| ***NOTE*** | | *Darts will not be vouchered but should be disposed of in a "sharps" container by medical personnel. Members of the service should refrain from handling a dart that has been removed from a subject.* |
| **INVESTIGATING SUPERVISOR** | 31. | Conduct investigation regarding use of CED. |
| | 32. | Notify Firearms and Tactics Section: |
| | | a. Obtain "FTS CED Log Number" |
| | | b. Enter "FTS CED Log Number" and name of person notified in Telephone Record. |
| | 33. | Prepare **LESS LETHAL/RESCUE EQUIPMENT USE REPORT.** |
| | | a. Prepare **REPORT** when probes are discharged regardless of whether probes made contact with subject. |
| | | b. Enter "FTS CED Log Number" on **REPORT** |
| | | c. Deliver **REPORT** to commanding officer. |
| | 34. | Deliver copies of other reports prepared in connection with CED usage to commanding officer. |

## NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 7 of 8 |

| | | |
|---|---|---|
| **COMMANDING OFFICER/ DUTY CAPTAIN** | 35. | Conduct investigation when required to act as investigating supervisor. |
| | 36. | Prepare a **Typed Letterhead** with results of investigation and include recommendations (e.g., recommend disciplinary action, retraining, use was within guidelines, etc.)when: |
| | | a.  CED is used in touch stun mode only |
| | | b.  Used on a person in police custody |
| | | c.  Accidental discharge of a CED has resulted in an injury to any person. |
| | 37. | Attach copy of **Typed Letterhead**, if prepared, to the completed **LESS LETHAL/RESCUE EQUIPMENT USE REPORT**. |
| | 38. | Distribute copies of **Typed Letterhead**, when prepared, and attached **LESS LETHAL/RESCUE EQUIPMENT USE REPORT** to the following: |
| | | a.  Chief of Department (THROUGH CHANNELS) |
| | | b.  Chief, Internal Affairs Bureau |
| | | c.  Bureau Chief concerned |
| | | d.  Commanding Officer, Firearm and Tactics Section (DIRECT) |
| | | e.  Commanding Officer concerned |
| **COMMANDING OFFICER, FIREARMS AND TACTICS SECTION** | 39. | Maintain a log /database for CED usage. |
| | 40. | Maintain copies of **LESS LETHAL/RESCUE EQUIPMENT USE REPORTS** in a binder and input data into database. |
| | 41. | Maintain a database of information regarding **LESS LETHAL/RESCUE EQUIPMENT USE REPORTS**. |
| | 42. | Compile data regarding use and effectiveness of CEDs used by members of the Department. |
| | 43. | Compile a list of CED usage on a monthly basis and forward to the Chief of Department. |
| | 44. | Incorporate relevant information into tactical training. |
| **COMMANDING OFFICER, INVESTIGATION REVIEW SECTION** | 45. | Review adequacy of investigations and appropriateness of CED usage. |
| **ADDITIONAL DATA** | | *If a CED has been seized for investigative purposes, it is the responsibility of the investigative unit to ensure a notification is made to the Commanding Officer, Firearms and Tactics Section.  Commands which have had a CED seized for investigative purposes will be responsible for retrieving the CED upon the conclusion of the investigation.* |
| **RELATED PROCEDURES** | | *Prisoners Requiring Medical/Psychiatric Treatment (P.G. 210-04)* |
| | | *Release of Prisoner – General Procedure (P.G. 210-13)* |
| | | *Aided Cases - General Procedure (P.G. 216-01)* |
| | | *Mentally Ill or Emotionally Disturbed Persons (P.G. 216-05)* |
| | | *Invoicing Property – General Procedure (P.G. 218-01)* |
| | | *Required Equipment (P.G. 204-09)* |
| | | *Use of Force (P.G. 203-11)* |
| | | *Deadly Physical Force (P.G. 203-12)* |

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-117 | 08/01/13 | | 8 of 8 |

**FORMS AND REPORTS**

*PROPERTY CLERK INVOICE WORKSHEET (PD521-141A)*
*AIDED REPORT WORKSHEET (PD 304-152B)*
*LESS LETHAL/RESCUE EQUIPMENT USE REPORT (PD 320-151)*
*ON-LINE BOOKING SYSTEM ARREST WORKSHEET (PD 255-159)*
*MEDICAL TREATMENT OF PRISONER (PD 244-159)*
*ACTIVITY LOG (PD112-145)*
*INVESTIGATOR'S DAILY ACTIVITY REPORT (PD439-156)*
*Typed Letterhead*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# APPENDIX B

# Overview of Seattle Police Department
# Documentation of Force Policy

**Overview of Seattle Police Department Documentation of Force Policy**

Seattle Police Department's (SPD's) Use of Force policy outlines the elements that must be included in the use-of-force report for each level of reportable use of force:

For **Type I Force**, the report must include "the name and serial number of the officer who used force;" "the names of the other officers or identified witnesses present," "an account of the officer's actions in using force," "the suspect's actions that led to the application of force," "a detailed description of any force and non-force actions used to achieve the law enforcement objective, and the observed results, and "the name of the supervisor screening the incident."[1]

For **Type II Force**, the report must include, "the name and serial number of the officer who used force," "the names of other officers, whether or not they used force, and identified witnesses present," "a detailed description of the circumstances, and the valid law enforcement objective, that led up to the contact with the subject," "a detailed description of the circumstances, and the valid law enforcement objective, that led up to the contact with the subject," "a detailed description of the words, actions or behaviors of the subject that precipitated the need for force," "a detailed description of any force and non-force actions used, how those actions furthered the intended law enforcement objective, and the observed results," "a detailed description of any force clearly observed being used by other officers during this incident," "a detailed description of any apparent injury to the subject, any complaint of injury, or the lack of injury, including information regarding any medical aid or medical evaluation provided," "the name and serial number of the sergeant who screened the incident."[2]

For **Type III Force**, rather than provide a written report, if requested to do so, officers are to participate in an audio-taped interview with the case sergeant and detectives by the conclusion of their shift, unless exigent circumstances require an extension. The interview is to include, "the name and serial number of the officer who used force," "the names of other officers or identified witnesses present," "a detailed description of the circumstances that led up to the contact with the subject," "a detailed description of the words, actions or behaviours of the subject that precipitated the need for force," "a detailed description of any force and non-force actions used to achieve the law enforcement objective, and the observed results," "a detailed description of any force clearly observed being used by other officers during this incident," "a detailed description of any apparent injury to the subject, any complaint of injury, or the lack of injury, including information regarding any medical aid or medical evaluation provided," and "the name and serial number of the sergeant who screened the incident."[3]

---

[1] Seattle Police Dep't, Seattle Police Department Manual, 8.400-POL-1 Use of Force – Reporting and Investigation (Effective Sept. 1, 2015), http://www.seattle.gov/police-manual/title-8---use-of-force/8400---use-of-force-reporting-and-investigation.

[2] *Id.*

[3] *Id.*

Under this policy, "[a]ll uses of force are reportable except for de minimis force, which is described as "[p]hysical interaction meant to separate, guide, and/or control that does not cause pain or injury."[4]  For example, using "hands or equipment to stop, push back, separate or escort, the use of compliance holds without the use of sufficient force to cause pain, and unresisted handcuffing without transient pain."[5]

---

[4] *Id.*
[5] *Id.*

# APPENDIX C

# Overview of Seattle Police Department De-Escalation Training

**Overview of Seattle Police Department De-Escalation Training**

Seattle Police Department's (SPD) in-service training program includes a four-hour unit dedicated to de-escalation, called "Tactical De-Escalation." The training unit consists of both a classroom lecture and hands-on, scenario-based exercises. During the training, cadets learn how to de-escalate situations with a series of verbal techniques, known as the "O.P.E.N. Model." The techniques are:

1) **O**: Open-ended questions;
2) **P**: Paraphrasing;
3) **E**: Empathy statements; and
4) **N**: Next steps.

Officers participate in body language and body positioning exercises and practice the O.P.E.N. Model in oral de-escalation drills.

SPD's training also includes another tactical de-escalation model, called "3-S." The 3-S model consists of three steps for officers to take in order to de-escalate an encounter:

1) **Scene Control** ("use techniques to reduce officer and civilian exposure to risk;" "slow down events;" "[employ] trained de-escalation skills to reduce potential escalation;" and "perform a threat assessment")
2) **Start Suspect Engagement** ("begin communicating with the suspect")
3) **Solution** ("employ reasonable de-escalation tactics;" "assess if the suspect can be arrested or seized without significant escalation of force;" and "after a verbal warning, arrest the suspect if necessary.")[6]

The 3-S model is based on "a nationally recognized hostage negotiation force-reduction model for tactical incidents" and "was developed to provide patrol officers a streamlined version of de-escalation to employ in dynamic situations such as traffic stops or tactical events."[7] The 3-S model puts a major emphasis on active listening and extended communication.

Another portion of SPD's Tactical De-Escalation training teaches officers the "7 Stages of Escalation," which are:

1) **Calm**: Person relatively calm / cooperative.
2) **Trigger**: Person experiences unresolved conflicts. This triggers the person's behavior to escalate.
3) **Agitation**: Person increasingly unfocused /upset.
4) **Acceleration**: Conflict remains unresolved. Person focuses on the conflict.
5) **Peak**: Person out of control / exhibits severe behavior.

---

[6] Seattle Police Dep't Education & Training Section, Tactical De-Escalation 2015 Training Plan 9 (2015).
[7] Id. at 8.

6)  De-escalation: Vents in the peak stage, person displays confusion.  Severity of peak behavior subsides.

7)  Recovery: Person displays willingness to participate in activities.

The 7 Stages of Escalation lecture details how escalation levels increase, how to look out for various aggression triggers, and how tactical de-escalation can lead to a positive outcome in these incidents.[8]

---

[8] *Id.* at 23-4.

## Overview of 2012 Memorandum of Understanding between CCRB and NYPD

After substantiating an allegation of police misconduct, CCRB's practice is to recommend that NYPD discipline the subject officer involved. Until recently, all substantiated CCRB cases were sent to NYPD's Department Advocate's Office (DAO) for review and consideration of recommended penalties, and if Administrative Charges were recommended, possible prosecution.

Traditionally, DAO attorneys reviewed the complete CCRB investigative file, examined the subject officer's prior disciplinary record, performance record, and history of CCRB complaints, and, where relevant, considered the viability of a prosecution for Administrative Charges. Based on its independent review of these factors, DAO developed its own case analysis and recommendation memorandum for each case, which either supported or differed from the findings and recommendations of CCRB. Notably, DAO is not an investigative unit and does not conduct its own independent investigations. Instead, DAO reviewed and evaluated CCRB's investigations with an eye toward making disciplinary recommendations to the Police Commissioner and, where Administrative Charges were sought, determining whether prosecution was viable).[9] When DAO agreed that Administrative Charges were appropriate, it prepared and served Charges and Specifications on the subject officer and proceeded to a trial or negotiated settlement before an administrative law judge within NYPD's Office of the Deputy Commissioner of Trials.

In 2012, NYPD and CCRB signed a Memorandum of Understanding (MOU) that shifted responsibility for prosecuting substantiated CCRB excessive Force, abuse of authority, discourtesy, and offensive language cases from NYPD's DAO to CCRB's own, newly created

---

[9] *See, e.g.,* Testimony of Julie Schwartz at 4462:16-4468:17, *Floyd v. City of New York*, No. 08-cv-1034(SAS) (S.D.N.Y. Aug. 12, 2011).

Administrative Prosecution Unit (APU).[10]  CCRB prosecutors from the APU have been handling the prosecutions of substantiated FADO cases since April 11, 2013.[11]

Importantly, to promote uniformity in prosecutions and disciplinary recommendations, the MOU requires that APU attorneys endeavor to understand and apply the same disciplinary processes and standards used by NYPD, to the extent practicable and relevant.[12]  The MOU also expressly contemplates a cooperative relationship between DAO and the APU "as needed to effectively evaluate, prepare, and prosecute" each case.[13]

The decision to prosecute a substantiated use-of-force case is not the end of the story. Whether DAO or APU files Administrative Charges and brings a case to trial before the Deputy Commissioner of Trials or makes a disciplinary recommendation of something less severe than Administrative Charges, the issue of discipline is ultimately left to the discretion of the Police Commissioner. Only the Police Commissioner has the authority to actually impose discipline upon a police officer or to decide whether to impose discipline at all.[14]

---

[10] The MOU provides for limited exceptions where the Police Commissioner may retain jurisdiction of substantiated FADO cases "where the Police Commissioner determines that CCRB's prosecution of Charges and Specifications in a substantiated case would be detrimental to the Police Department's disciplinary process." For example, the Police Commissioner may decide to not allow CCRB's APU to prosecute substantiated cases where there are parallel or related criminal investigations or when the Police Commissioner determines that the interests of justice would not be served, based on the subject officer's lack of disciplinary history or prior substantiated CCRB complaints. See MEMORANDUM OF UNDERSTANDING BETWEEN THE CIVILIAN COMPLAINT REVIEW BOARD (CCRB) AND THE POLICE DEPARTMENT (NYPD) OF THE CITY OF NEW YORK CONCERNING THE PROCESSING OF SUBSTANTIATED COMPLAINTS ¶¶ 2, 20 (April 2, 2012) [hereinafter Memorandum of Understanding of April 2, 2012], available at http://www.nyc.gov/html/ccrb/downloads/pdf/APU_MOU.pdf. Significantly, the APU has authority to prosecute and plea bargain only cases where Administrative Charges are being filed. It does not have jurisdiction over cases where a Command Discipline or Instructions are recommended. While CCRB may, with approval of the CCRB Board, decline charges for prosecution altogether, it is not authorized to decline prosecution of Administrative Charges and then recommend lower levels of discipline. See, e.g., Memorandum of Understanding of April 2, 2012 at ¶¶ 1, 12, 21.

[11] See CIVILIAN COMPLAINT REVIEW BD., JANUARY – JUNE 2013 REPORT 15 (Dec. 2013), http://www.nyc.gov/html/ccrb/downloads/pdf/CCRBsemi2013_jan_June.pdf.

[12] See Memorandum of Understanding of April 2, 2012 at ¶ 11.

[13] Id. at ¶ 16.

[14] See, e.g., NEW YORK CITY ADMINISTRATIVE CODE, tit. 14, § 14-115 ("Discipline of Members"); NEW YORK CITY CHARTER, ch. 18, § 434; RULES OF THE CITY OF NEW YORK, tit. 38, ch. 15B, §§ 15-12, 15-18; see also, RULES OF THE CITY OF NEW YORK, tit. 38-a, ch. 1, § 1-45 ("Rules of the Civilian Complaint Review Board") ("The Police Commissioner shall retain in all respects the authority and discretion to make final disciplinary recommendations."); NEW YORK CITY CHARTER, ch. 18-A, § 440(e).